## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ZACHARY ALAN STARR, derivatively on behalf of the VAN KAMPEN EQUITY AND INCOME FUND, the VAN KAMPEN EQUITY TRUST, the VAN KAMPEN INVESTMENT COMPANIES and the VAN KAMPEN MUTUAL FUNDS,[1] | : : : : : : : : : : | CIVIL ACTION<br><br>Case No.<br><br><br>Jury Trial Demanded |
| **Plaintiff** | : : | |
| **v.** | : : : | |
| VAN KAMPEN INVESTMENTS, INC., VAN KAMPEN ASSET MANAGEMENT, INC., VAN KAMPEN INVESTOR SERVICES INC., VAN KAMPEN FUNDS, INC., MORGAN STANLEY, MORGAN STANLEY INVESTMENT: ADVISORS, INC., MORGAN STANLEY INVESTMENTS LP, MORGAN STANLEY INVESTMENT MANAGEMENT INC., DAVID C. ARCH, J. MILES BRANAGAN, JERRY D. CHOATE, ROD DAMMEYER, LINDA HUTTON HEAGY, R. CRAIG KENNEDY, HOWARD J. KERR, HUGO F. SONNENSHEIN, JACK E. NELSON, SUZANNE H. WOOLSEY, MITCHELL C. MERIN, RICHARD F. POWERS, WAYNE W. WHALEN, BANK OF AMERICA CORP., BANC OF AMERICA SECURITIES LLC, PRUDENTIAL SECURITIES INC., and CANADIAN IMPERIAL BANK OF COMMERCE | : : : : : : : : : : : : : : : : : : : : : : : | |
| **Defendants** | : | |

---

[1] A list of the Van Kampen Mutual Funds and the Van Kampen Investment Companies, which are registered investment companies under the Investment Company Act (ICA), comprising the Van Kampen family of funds is attached to this Complaint as Exhibit A. The Van Kampen Investment Companies are sometimes referred to herein as the **"Trusts"** and, collectively with the Van Kampen Mutual Funds, are referred to as the **"Funds"** or **"Van Kampen Funds."**

**and**                                    :

**the VAN KAMPEN EQUITY AND INCOME**       :
**FUND, the VAN KAMPEN EQUITY TRUST,**     :
**the VAN KAMPEN INVESTMENT**              :
**COMPANIES and the**                      :
**VAN KAMPEN MUTUAL FUNDS**                :
                                           :
          **Nominal Defendants**   :
_____ :

## VERIFIED DERIVATIVE COMPLAINT

**DEFENDANTS**

VAN KAMPEN INVESTMENTS, INC.
VAN KAMPEN ASSET MANAGEMENT, INC
VAN KAMPEN INVESTOR SERVICES INC.
VAN KAMPEN FUNDS, INC.
MORGAN STANLEY
MORGAN STANLEY INVESTMENT ADVISORS, INC.
MORGAN STANLEY INVESTMENTS LP
MORGAN STANLEY INVESTMENT MANAGEMENT INC.
DAVID C. ARCH
J. MILES BRANAGAN
JERRY D. CHOATE
ROD DAMMEYER
LINDA HUTTON HEAGY
R. CRAIG KENNEDY
HOWARD J. KERR
HUGO F. SONNENSHEIN
JACK E. NELSON
SUZANNE H. WOOLSEY
MITCHELL C. MERIN
RICHARD F. POWERS
WAYNE W. WHALEN
BANK OF AMERICA CORP.
BANC OF AMERICA SECURITIES LLC
PRUDENTIAL SECURITIES INC.
CANADIAN IMPERIAL BANK OF COMMERCE

## TABLE OF CONTENTS

Page

I.    SUMMARY OF THE ACTION .................................................................1

II.   JURISDICTION AND VENUE ...........................................................6

III.  PARTIES.............................................................................................7

      A.    Plaintiff..............................................................................7

      B.    Defendants and Non-Defendant Participants...................................7

            Van Kampen Defendants..........................................................7

            Morgan Stanley Defendants.....................................................10

            Trustee Defendants...............................................................11

            Fiduciary Defendants............................................................15

            Additional Defendants...........................................................16

            Nominal Defendants.............................................................20

IV.   STATEMENT OF FACTS..................................................................21

      A.    General Factual Allegations.....................................................21

            (1)   Introduction................................................................21

            (2)   NAV Pricing..............................................................24

            (3)   Market Timing Transactions............................................25

            (4)   Late Trading..............................................................28

            (5)   Mutual Fund "Short Selling" Strategy................................31

            (6)   Market Timing Is Easy to Detect and Has Been
                  Well-Known Since 1997.................................................32

            (7)   Market Timing Arrangements...........................................38

            (8)   Banc of America Securities LLC.......................................42

i

B.     Market Timing and Late Trading in the Van Kampen Funds...............48

(1)     Aurum, Pritchard, Trautman, and Their Clients'
        Trading Through the Box.................................................48

(2)     Canary's Timing Activity in Van Kampen...........................49

(3)     Timing Through Prudential............................................51

(4)     Timing Policies in the Van Kampen Funds.........................53

(5)     Impact of Market Timing...............................................54

(6)     The Van Kampen Defendants and the Morgan
        Stanley Defendants Directly Benefited From the
        Market Timing and Late Trading......................................59

(7)     Standing...................................................................63

(8)     Breach of Contract Allegations.........................................64

V.     DEMAND EXCUSED ALLEGATIONS...................................65

COUNT I - VIOLATIONS OF SECTIONS 36(b) OF THE
INVESTMENT COMPANY ACT
(Against the Adviser Defendants, Transfer Agent and Distributor)................71

COUNT II – VIOLATION OF SECTION 36(A) OF THE
INVESTMENT COMPANY ACT
(Against The Adviser Defendants, Distributor, and Trustees).....................74

COUNT III – VIOLATIONS OF SECTION 47 OF THE
INVESTMENT COMPANY ACT
(Against the Adviser Defendants and the Distributor)..............................77

COUNT IV – VIOLATION OF SECTIONS 206 AND 215
OF THE INVESTMENT ADVISERS ACT OF 1940
(Against Adviser Defendants and Distributor)......................................77

COUNT V – CONTROL PERSON LIABILITY UNDER
SECTION 48 OF THE INVESTMENT COMPANY ACT
(Against Morgan Stanley, Van Kampen Investments, Inc.
And the Trustees)....................................................................79

COUNT VI – COMMON LAW BREACH OF
FIDUCIARY DUTY
(Against the Fiduciary Defendants)…………………………………………..…79

COUNT VII – BREACH OF CONTRACT
(Against the Adviser Defendants and the Distributor)…………………………..81

COUNT VIII – BREACH OF CONTRACT
(Against BAS)………………………………………………………………………82

COUNT IX – AIDING AND ABETTING BREACH
OF FIDUCIARY DUTY
(Against the Additional Defendants)……………………………………………84

COUNT X – UNJUST ENRICHMENT
(Against All Defendants)…………………………………………………………...85

COUNT XI – COMMON LAW INTERFERENCE
WITH CONTRACT
(Against the Additional Defendants)……………………………………………85

COUNT XII – CIVIL CONSPIRACY
(Against All Defendants)…………………………………………………………...86

The Plaintiff, Zachary Alan Starr, derivatively on behalf of the Van Kampen Equity and Income Fund, the Van Kampen Equity Trust, the Van Kampen Investment Companies (the **"Trusts"**), and the Van Kampen Mutual Funds (together with the Trusts, the **"Funds"** or **"Van Kampen Funds"**) comprising the Van Kampen Family of mutual funds hereby complains against the Defendants as follows:

## I.    SUMMARY OF THE ACTION

1.    This derivative action seeks to recover damages for the Funds for harm inflicted upon them by their own fiduciaries, who breached their fiduciary duties to the Funds, including those arising under Sections 36(b) and 36(a) of the Investment Company Act of 1940 (the "ICA") and Sections 206 and 215 of the Investment Advisers Act of 1940 (the "IAA"), and by those who participated in a manipulative scheme to enrich themselves at the expense of the Funds through rapid in-and-out trading in the Funds, a practice commonly called "market timing" or "timing," and trading in shares of the Funds after the close of the financial markets each day, a practice commonly called "late trading."

2.    This Complaint seeks redress for harm caused by the managers and investment advisers of mutual funds who, in order to share in the substantial profits that market timing and late trading generate, combined with the market timers and others, and allowed them to prey upon the Funds to which they owed the highest fiduciary duties of loyalty, candor, and due care.  This Complaint also seeks redress for the harm caused by the Trustees and Directors[1] of the Trusts who failed or refused to perform their fiduciary

---

[1] As is explained more fully below, all of the Van Kampen Registered Investment Companies are organized as trusts except one, Van Kampen Series Fund Inc., which is

duties to manage and supervise the Funds and enforce the manager's duties in the best interests of the Funds.

3.     Market timing and late trading have been extremely harmful to the Funds. Market timing and late trading have caused hundreds of millions of dollars of harm to the Funds, primarily by inflating transaction costs and administrative costs, and adding unnecessary marketing and distribution costs, all of which are paid by the Funds. Market timing also causes serious, known disruptions to mutual funds and their operations. Market timing forces portfolio managers to keep excess quantities of cash available in the funds to redeem market timers' shares when they sell out a position – cash that otherwise should be used to invest. Trading protocols are upset as capital available for investment fluctuates unpredictably, preventing portfolio managers from implementing their investment strategies for the Funds. The effect of this is to reduce the returns earned by the Funds.

4.     Market timing and late trading have harmed each and every Fund and Trust in the Van Kampen family of mutual funds, whether or not the particular Fund or Trust was the direct victim of market timing or late trading. This is so because some expenses, such as service agent fees, statement costs, transaction costs, and interest charges on borrowing that increase as a result of market timing and late trading may be shared among all Funds, including timed-funds and non-timed funds alike. Moreover, where service fees are charged as a percentage of assets in the funds and the cost of providing those services increases as a result of market timing, the service provider will

---

organized as a Maryland Corporation. For simplicity, this complaint refers to them all as Trusts. The same individuals serve as Trustee or Director for each of the Trusts.

charge a higher percentage across all funds in order to recoup the added costs of servicing the timed fund.

5.      Because of these and other problems caused by market timers, fund managers for years have had in place policies and practices designed to monitor and deter market timing, including redemption penalties.

6.      Conversely, market timing and late trading have been extremely profitable for market timers, and, moreover, impose little risk.  Because the price movement of the underlying securities will almost certainly be followed, sometimes within a matter of hours, by a corresponding movement in the price of the funds' shares, the realization of profit on the pricing inefficiency is almost a sure bet.  Market timers exploit price inefficiencies inherent in the forward pricing structure of mutual funds.

7.      Moreover, timed or late trades cost little or nothing to execute because most timed mutual funds do not charge commissions, or "loads," for trades, thus shifting the transaction costs for market timing from the market timers to the funds themselves. Thus, for example, a one day trade can yield a net gain in excess of 100 percent, while the costs of timing are pushed off on the Funds as the timers move in and out of no-load funds, parking their winnings in liquid cash funds between trades.

8.      Market timers and late traders could not reap these profits simply by investing in the securities held in the Funds' portfolios, because (a) the timers would bear significant transaction costs and tax consequences if they bought and sold individual securities, which are foisted upon the Funds under the market timing and late trading scheme, and (b) the underlying securities trade in the open market and are efficiently priced, as opposed to the inefficient prices of mutual fund shares, which would deny market timers the opportunity to execute trades at unfair prices.

9.      In addition to the market timers themselves, who reaped quick and easy profits at the expense of the Funds, the advisers to the Funds and their affiliates also reaped hundreds of millions of dollars in unearned advisory, management, administrative, marketing, and distribution fees from the Funds without disclosing that they permitted, facilitated, encouraged or participated in the improper activity.   At a minimum, the advisors failed to detect and/or prevent, market timing and late trading in the Funds – the types of abusive transactions they were obligated to prevent.   Simply put, the advisers abandoned their fiduciary duties to the Funds in order to inflate the already huge fees they received from the Funds.

10.     Market timing and late trading results from the wholesale abdication of the fiduciary obligations the defendants owed to the Funds.   As William H. Donaldson, Chairman of the SEC, recently observed in commenting upon the scandal that has engulfed the entire mutual fund industry:

> The relationship between an investment adviser and its clients is supposed to rest on a bedrock foundation of fiduciary principles.   It is extremely troubling that so much of the conduct that led to the scandals in the mutual fund industry was, at its core, a breach of the fiduciary relationship between investment advisers and their advised funds.   As fiduciaries, advisers owe their clients more than mere honesty and good faith.   Recent experience suggests that all too many advisers were delivering much less.[2]

11.     The market timing and late trading scandal results from the substantial and unresolved conflicts of interest between mutual funds and the investment advisers who create and manage the funds.   Those conflicts of interest have manifested themselves in widespread instances of improper market timing and late trading in the mutual funds, all to the detriment of the Funds.

---

[2] Opening Statement at an open Commission meeting on May 26, 2004 (available at http://www.sec.gov/news/speech/spch052604.htm).

12.     The nature and extent of those conflicts of interest, the market timing they led to, and the adverse impact they caused to the Funds were known by certain of the Trustees and Directors of the Funds, who nonetheless approved or ratified the Fund adviser's management agreements each year, and were not adequately disclosed to or understood by other Trustees and Directors of the Funds, who approved or ratified the Fund adviser's management agreements each year despite the harm the adviser caused or permitted to the Funds and who approved or ratified plans permitting the adviser to charge and collect marketing and distribution fees under Rule 12b-1 of the SEC promulgated under the ICA in violation of the directors' own duties to the Funds.

13.     This action is brought by a shareholder of the Funds on behalf of the Funds to recover damages for the Funds from those who are responsible for the wrongdoing and from those who profited, directly or indirectly, from the wrongdoing. These damages include, but are not limited to:

(a)     forfeiture and return of the management, administration, distribution, and marketing fees and all other compensation paid to the investment adviser and its affiliates during the period of market timing and late trading;

(b)     damages to the Funds for profits earned by the Fund Adviser and its affiliates (including officers and employees of the Fund Adviser) from market timing or late trading arrangements;

(c)     damages to the Funds for direct and indirect injury, including increased transaction costs, liquidity costs, tax expenses, and lost investment opportunities, caused by market timing or late trading; and

(d)     damages to the Funds for 12b-1 fees paid to the Fund Adviser and its affiliates (including third-parties) in excess of the corresponding economic benefit to the Funds.

14.     This action is also brought by a shareholder on behalf of the Funds to obtain injunctive relief for the Funds, including but not limited to:

(a)     rescission of the adviser's management and other agreements with the Funds;

(b)     rescission of the 12b-1 Plans adopted by the Funds;

(c)     removal of the Fund adviser and its affiliates that manage and perform other services for the Funds; and

(d)     removal of each of the Trustees and Directors of the Funds named in this Complaint and replacing them with independent Trustees and Directors.

## II.     JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to Section 44 of the ICA, 15 U.S.C. § 80a-43, Section 214 of the IAA, 15 U.S.C. § 80b-14, and 28 U.S.C. § 1331(a).

16.     This Court also has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over the state law claims asserted herein because they arise out of and are part of the same case or controversy as Plaintiff's federal claims.

17.     Venue is proper in this District because some or all of the Defendants conduct business in this District and some of the Trusts are organized in this District.

18.     In connection with the acts and practices alleged herein, defendants directly or indirectly used the instrumentalities of interstate commerce, including, but not

limited to, the mails, interstate telephone communications, and the facilities of the national securities markets and national securities exchanges.

19.     This Complaint relates to the *In re Mutual Funds Investment Litigation*, MDL 1586, which was transferred to this District for pretrial proceedings by the Judicial Panel on Multidistrict Litigation on February 20, 2004.

### III.     PARTIES

**A.     Plaintiff**

20.     *Plaintiff Zachary Alan Starr* (**"Plaintiff"**), a resident of East Quogue, Suffolk County, New York, owns shares of the Van Kampen Equity and Income Fund and shares of the Van Kampen Small Cap Value Fund which were purchased in the Fall of 2002 and continues to hold such shares.  The Equity and Income Fund is organized as the *sole series* of a Delaware Statutory Trust.  The Small Cap Value Fund is one of six series of the Van Kampen Equity Trust, a Delaware Statutory Trust.  Both trusts, as well as all of the other Trusts, are Registered Investment Companies under the ICA, 15 U.S.C. §80a-8.

**B.     Defendants and Non-Defendant Participants**

21.     The **"Van Kampen"** Defendants are as follows:

(a)     *Defendant Van Kampen Investments, Inc.* (**"Van Kampen Investments"**), is the immediate parent of the Funds' Adviser, Distributor, and Transfer Agent (see below). Van Kampen Investments is a diversified asset management company that administers more than three million retail investor accounts portfolios and had more than $87 billion under management or supervision as of March 31, 2004.  Van Kampen Investments directly or indirectly manages over 50 open-end mutual funds, 30 closed-end funds, and 2,700 unit investment trusts. Van Kampen Investments is an indirect, wholly

owned subsidiary of Morgan Stanley (see below) and is headquartered at 1 Parkview Plaza, P.O. Box 5555, Oakbrook Terrace, Illinois 60181.

(b)     *Defendant Van Kampen Asset Management, Inc.* (**"VKAM"**) at relevant times was registered as an investment adviser under the IAA and is the investment adviser for all of the Van Kampen Funds pursuant to investment advisory contracts.   Thus VKAM served as investment adviser to the Equity and Income Fund and Small Cap Value Fund, as well as all other Funds.   VKAM is a wholly-owned subsidiary of Van Kampen Investments and an indirect subsidiary of Morgan Stanley.   VKAM manages the Funds' assets pursuant to Investment Advisory Agreements entered into with the Trusts on behalf of the Van Kampen Mutual Funds.    VKAM is also headquartered at 1 Parkview Plaza, P.O. Box 5555, Oakbrook Terrace, Illinois.   VKAM receives fees calculated as a percentage of net assets under management in the Funds it advises.   The fees are enormous.   For example, for the year ended December 31, 2003, the Equity and Income Fund alone paid nearly $24 million in fees to the Adviser.

(c)     *Defendant Van Kampen Investor Services Inc.* (**"Transfer Agent"**) is the transfer agent, shareholder servicing agent, and dividend disbursing agent for the Funds.   The Transfer Agent is a wholly owned subsidiary of Van Kampen Investments and an indirect subsidiary of Morgan Stanley.   The Transfer Agent is an "affiliate" of VKAM and the Adviser Defendants (defined below) and each of them as that term is defined in the ICA, 15 U.S.C. §80-2(a)(2).   The principal office of the Transfer Agent is located at 2800 Post Oak Boulevard, Houston, Texas 77056.   The Transfer Agent is responsible for, among other things, processing shareholder purchases and redemption orders and maintaining account records and was therefore in a position to identify and prevent the unlawful market timing and late trading practices described in this Complaint.

The transfer agency fees are determined through negotiations with the Funds and are approved by the Trustees and Directors of the Funds. Although these fees are typically millions of dollars per Fund the Funds' prospectuses do not disclose the amounts or methods of computing Transfer Agency fees. The transfer agency fees are only disclosed in year-end annual reports after they have been paid. The transfer agency and shareholder service fees for the Equity and Income Fund alone for the fiscal year ended December 31, 2003 were approximately $12 million.

(d)     *Defendant Van Kampen Funds, Inc.* (**"Distributor"**) is the Distributor and primary underwriter for each of the Funds. The Distributor is a wholly-owned subsidiary of Van Kampen Investments and an indirect subsidiary of Morgan Stanley. The Distributor is an "affiliate" of VKAM and the Adviser Defendants (defined below) and each of them as that term is defined in the ICA, 15 U.S.C. §80-2(a)(2). The Distributor receives fees from the Funds in the form of payments pursuant to 12b-1 Plans and Service Plans, which plans provide that the Funds may spend a portion of the Funds' average daily net assets attributable to each class of shares in connection with the distribution of the respective class of shares and in connection with the provision of ongoing services to shareholders of such class, respectively. The fees received by the Distributor under the 12b-1 and Service plans are enormous, and often dwarf Advisory fees paid by the Funds. For example, for the year ended December 31, 2003, the Equity and Income Fund alone paid nearly $39 million in 12b-1 and Service Plan fees to the Distributor. Because both the 12b-1 Plans and Service Plans are adopted pursuant to Rule 12b-1, they are collectively referred to herein simply as "12b-1 Plans". The Distributor also receives payments in the form of sales charges and commissions. For the year ended December 31, 2003, the Distributor received commissions on sales of

approximately $6.3 million and sales charges on redeemed shares of approximately $4.4 million from investors in the Equity and Income Fund.[3]

(e)     The Van Kampen Defendants license the Van Kampen name to the Funds.

22.     The **"Morgan Stanley Defendants"** are as follows:

(a)     *Defendant Morgan Stanley* **("Morgan Stanley")** is the ultimate parent of all of the Defendants bearing the "Morgan Stanley" and "Van Kampen" names (excepting the Funds).   Through its subsidiaries, Morgan Stanley is a full service securities firm that markets, sponsors, and provides investment advisory, distribution, and administrative services to mutual funds.  Morgan Stanley is incorporated in Delaware and is located at 1585 Broadway, New York, New York 10036.  Morgan Stanley was a beneficiary of the compensation, profits and other benefits received from the schemes described in this Complaint.

(b)     *Defendant Morgan Stanley Investment Advisors, Inc.* **("MSIA")**, a wholly owned subsidiary of Morgan Stanley.  MSIA is a registered an investment adviser under the IAA.  MSIA managed and advised proprietary funds marketed and sponsored directly or indirectly by Morgan Stanley and was the Sub-Adviser to certain of the Van Kampen Funds pursuant to a sub-advisory contract.  MSIA is headquartered at 1221 Avenue of the Americas, New York, New York 10020.  MSIA received fees calculated as a percentage of net assets under management for the Funds it advised making it a beneficiary of the schemes described in this Complaint.

---

[3] Unlike 12b-1 and Service Plan fees, the commissions and sales charges are not paid by the Trusts and Funds themselves.  However, they further illustrate the enormous amount of fees the Distributor, and therefore Van Kampen Investments, receives.

(c)  *Defendant Morgan Stanley Investments LP* (**"MSLP"**) is registered as an investment adviser under the IAA, and is an indirect wholly owned subsidiary of Morgan Stanley.  MSLP managed and advised proprietary funds for Morgan Stanley and certain Van Kampen Funds as Sub-Adviser pursuant to contract at times relevant to this Complaint.  MSLP is located at One Tower Bridge, West Conshohocken, Pennsylvania.

(d)  *Defendant Morgan Stanley Investment Management Inc.* (**"MSIM"**) is the subadviser to the following Van Kampen Funds: (1) Magnum International, (2) Emerging Markets, (3) Latin American, and (4) Asian Equity. Morgan Stanley Investment Management Inc. is a Delaware Corporation with its principle office located at 23 Church Street, 16-01 Capital Square, Singapore 049481.

23.  VKAM, MSIA, MSLP, and MSIM are referred to together as the **"Adviser Defendants."**  The Adviser Defendants at relevant times were responsible for the day-to-day management of the Van Kampen Funds.

24.  The **"Trustee Defendants"** are as follows:

(a)  The defendants named below are each Trustees of the Van Kampen Equity Trust and the Van Kampen Equity and Income Fund, and are Trustees or Directors for *all of the Funds*  (hereafter the **"Trustees"** or **"Trustee Defendants"**).

    i.  David C. Arch (58)

    ii.  J. Miles Branagan (71)

    iii.  Jerry D. Choate (65)

    iv.  Rod Dammeyer (62)

    v.  Linda Hutton Heagy (55)

    vi.  R. Craig Kennedy (51)

    vii.   Howard J. Kerr (67)

    viii.  Jack E. Nelson (67)

    ix.   Hugo F. Sonnenschein (62)

    x.    Suzanne H. Woolsey (61)

    xi.   Mitchell C. Merin[*] (50)

    xii.   Richard F. Powers[*] (57)

    xiii.  Wayne W. Whalen, Esquire[*] (64)

(b)     These Trustees are responsible for governing the Funds, protecting the interests of Funds' and their shareholders, general oversight of each Funds' business, assuring that the Funds are managed in the best interest of shareholders, and assuring that all rules and regulations of state and federal governmental regulatory agencies, and self-regulating organizations are followed.  The Trustees are "directors" within the meaning of the ICA, 15 U.S.C. § 80a-2(a)(12).

(c)     In theory, the Trustees have ultimate supervisory responsibility over the Funds and the Van Kampen Defendants.  However, for all practical purposes, the Trustees are controlled by the Van Kampen Defendants.

(d)     The Trustees of the Funds serve indefinitely and are not subject to regular shareholder election or review.  The Trustees are elected only at meetings held for that purpose, but the Funds hold meetings to elect Trustees only when *required to do so by the ICA*.  The ICA, in turn requires such a meeting only when the number of Trustees elected by the shareholders falls below a majority, but in the interim periods allows

---

[*]   Asterisk indicates that a Trustee/Director is an "interested person" within the meaning of the ICA.  Hereafter "Trustees" is used to mean Trustees or Directors, the only difference being in the form of the Investment Company they serve.  The number in parenthesis is the Trustee's age.

Trustee vacancies to be filled in any legal manner, so long as after filling the vacancy at least two thirds of the Trustees then holding office have been elected by a shareholder vote.

(e)     As a result of this system, Van Kampen Fund shareholders are rarely given the opportunity to elect Trustees.  In fact, the shareholders have not actually elected Trustees since **1999**.  The next previous elections were held in 1997, 1995 and 1993.  Four out of the ten "outside" Trustees *were never elected by shareholders at all*.  Defendants Arch, Dammeyer, Kerr, and Sonnenschein were *appointed* as Trustees on July 23, 2003 by the other Trustees.  Shareholders have not been given an opportunity to ratify or disapprove of their appointments.

(f)     Trustees serve indefinitely.  Each Trustee holds office until the earlier of the following:  (i) his/her successor is elected and qualified; (ii) his/her death; (iii) his/her resignation; (iv) when he/she reaches seventy-three years of age; or (v) he/she is removed.

(g)     Theoretically shareholders can call meetings to elect or remove Trustees but in order to call such a meeting shareholders holding at least 10% of the outstanding shares must request the meeting *AND the shareholders must pay in advance the estimated cost of preparing and mailing the notices of the meeting.*  Therefore, for all practical purposes the shareholders elect Trustees only when the Adviser Defendants decide to hold elections.

(h)     The Trustees appoint the officers for each of the Funds, to the extent the Funds have officers.  All of the officers appointed by the Trustees are also officers and employees of the Van Kampen and/or Morgan Stanley Defendants.

(i)     Non-Affiliated (non-interested) Trustees receive compensation from the Funds in the form of an annual retainer, plus a meeting fee.  Trustees may elect a deferred compensation plan whereby annual compensation will be deferred until retirement, earning until such time a rate of return computed with reference to the rate of return on the common shares of *any Fund in the open-end complex*.  In addition, Trustees receive a retirement benefit of $2500 per year for each year of service.

(j)     The chart below sets out the compensation for Trustees for the fiscal year ended December 31, 2003. Messrs. Arch, Dammeyer, Kerr and Sonnenschein were appointed to the Board of the Funds on July 23, 2003, and thus the amounts below reflect compensation from the Funds for the period July 23, 2003 until the fiscal year ended December 31, 2003.

| | Fund Complex | | |
|---|---|---|---|
| Name(1) | Pension or Retirement Benefits Accrued as Part of Expenses | Aggregate Maximum Annual Benefits from the Fund Complex Upon Retirement | Aggregate Estimated Total Compensation before Deferral from Fund Complex |
| **Independent Trustees** | | | |
| David C. Arch | $18,589 | $147,500 | $193,811 |
| J. Miles Branagan | 78,011 | 60,000 | 173,290 |
| Jerry D. Choate | 31,482 | 126,000 | 173,290 |
| Rod Dammeyer | 31,814 | 147,500 | 177,971 |
| Linda Hutton Heagy | 9,233 | 142,500 | 173,290 |
| R. Craig Kennedy | 6,424 | 142,500 | 173,290 |
| Howard J. Kerr | 58,713 | 147,500 | 193,811 |
| Jack E. Nelson | 40,711 | 109,500 | 173,290 |
| Hugo F. Sonnenschein | 32,178 | 147,500 | 193,811 |
| Suzanne H. Woolsey | 20,086 | 142,500 | 173,290 |
| **Interested Trustees** | | | |
| Wayne W. Whalen(1) | 63,604 | 147,500 | 251,811 |

(1) Trustees not eligible for compensation from the Funds are not included in the Compensation Table.

(k)     The Trustees are the only "independent" parties available to supervise the Funds.

(l)     The Board of Trustees has three standing committees:  the Audit Committee, Brokerage and Services Committee, and the Governance Committee.  The Brokerage and Services Committee reviews the Funds' allocation of brokerage transactions and the Funds' soft-dollar practices.  The audit committee makes recommendations to the Board of Trustees concerning the selection of independent public auditors, reviews with such auditors the scope and results of annual audits and considers any comments which the auditors may have regarding financial statements, books of account or internal controls. The Board's audit committee consists of Defendants J. Miles Branagan, Jerry D. Choate and R. Craig Kennedy.  The governance committee identifies individuals qualified to serve as Independent Trustees on the Board and on committees of the Board, advises the Board with respect to Board composition, procedures and committees, develops and recommends to the Board a set of corporate governance principles, monitors corporate governance matters and makes recommendations to the Board, and acts as the administrative committee with respect to Board policies and procedures, committee policies and procedures and codes of ethics.  The Board's governance committee consists of Defendants David C. Arch, Rod Dammeyer, Howard J Kerr and Jack E. Nelson.

25.     The Van Kampen Defendants, the Adviser Defendants, and the Trustee Defendants are referred to together as the **"Fiduciary Defendants."**

(a)     Each of the Fiduciary Defendants owed to the Funds as well as their shareholders the fiduciary duties of loyalty, candor and fair dealing, and the duty of full and candid disclosure of all material facts. Each of the Fiduciary Defendants owed to

the Funds, as well as their shareholders, the duty not to engage in deceptive contrivances or schemes, acts or transactions or courses of business that operate as a fraud or deception on the Funds and their shareholders.

(b)     Each of the Fiduciary Defendants owed to the Funds, as well as their shareholders, the duty to refrain from collecting excessive fees for compensation and other services and to preserve the Funds' property and assets to receive value and benefit to the funds for the fees paid, and the Trustee Defendants owed to the Funds the duty to be fully informed regarding that compensation.

(c)     Each of the Fiduciary Defendants owed to the Funds the duty not to place their own financial interests above those of the Funds and the shareholders.

(d)     The acts of the Fiduciary Defendants described in this Complaint were acts constituting willful misfeasance, bad faith, gross negligence and reckless disregard of the duties involved in the conduct of their office.

26.     The "**Additional Defendants**" are as follows:

(a)     *Defendant Bank of America Corp.* **("BOA")** is a Delaware corporation with its headquarters at Bank of America Corporate Center, 100 N. Tryon Street, Charlotte, North Carolina.[4]   BOA is a bank holding company and a financial holding company that provides a diversified range of banking and non-banking financial services and products.  BOA is the indirect parent of Banc of America Securities LLC.

(b)     *Defendant Banc of America Securities LLC* **("BAS")**, a Delaware limited liability company, is a wholly-owned subsidiary of NationsBanc Montgomery Holdings Corporation, which is itself a wholly owned subsidiary of NB Holdings

---

[4] Effective April 1, 2004, FleetBoston Financial Corporation ("Fleet"), a Rhode Island corporation, merged with and into BOA pursuant to an Agreement and Plan of Merger, dated as of October 27, 2003.

16

Corporation. NB Holdings Corporation is wholly owned by BOA. BAS, a registered broker-dealer, is a full-service United States investment bank and brokerage firm with principal offices in San Francisco, California; New York, New York; and Charlotte, North Carolina.   BAS is also registered as an investment adviser pursuant to the Investment Advisers Act of 1940.   In its capacity as broker-dealer, BAS accepts, executes and clears orders for hundreds of mutual funds, including the Funds.   BOA and BAS assisted certain preferred investors in market timing and late trading the Funds.

(c)    *Defendant Prudential Securities Inc.* (**"Prudential"**) was, prior to July 1, 2003, a wholly-owned broker-dealer subsidiary of Prudential Financial, Inc.   On July 1, 2003, its ownership was transferred to Wachovia Securities, LLC, a joint venture subsidiary of Wachovia Corporation and Prudential Financial, Inc.   As described more fully below, Prudential assisted certain preferred clients in substantial market timing of Van Kampen Funds.

(d)    *Defendant Canadian Imperial Bank of Commerce* (**"CIBC"**) is a bank and provider of financial services, incorporated in Canada, with its principal place of business 199 Bay Street, Toronto, ON, N5L 1A2, Canada. CIBC World Markets Corp., a Delaware corporation, is the investment arm of CIBC, with its principal place of business at 161 Bay Street, BCE Place, Toronto, ON, M5J 258, Canada.   CIBC Securities, Inc. is the Broker-Dealer arm of CIBC headquartered at 800 Bay Street, Toronto, Canada.   CIBC, through its subsidiaries, provided funding for clients of Prudential to market time the Van Kampen Funds.

27.    The persons and entities referred to in paragraphs 21 through 26 above are referred to together as the "**Defendants.**"

28.   The following non-defendant individuals and entities were active participants in the schemes alleged herein:

(a)   *Aurum Securities Corp.* (**"Aurum Securities"**), a California corporation, is a registered investment adviser and Broker-Dealer, with offices at 120 Montgomery Street, San Francisco, California.   Aurum was an active participant in the unlawful scheme alleged herein.

(b)   *Aurum Capital Management Corp.* (**"Aurum Capital"**), a California corporation, is a registered investment advisory firm headquartered at 84 West Santa Clara Street, Suite 690, San Jose, California. Aurum Capital is an affiliate of Aurum Securities.   Aurum Capital was an active participant in the unlawful scheme alleged herein.   Because Aurum and Aurum Capital are affiliated and collectively participated in the late trading and timing scheme alleged here, they collectively will be referred to as **"Aurum."**

(c)   *Canary Capital Partners, LLC* (**"CCP LLC"**), is a New Jersey limited liability company with its principal offices in Secaucus, New Jersey.   At relevant times, Canary was a hedge fund engaged in the business of late trading and timing mutual funds.   *Canary Capital Partners, Ltd.* (**"CCP Ltd."**), is a Bermuda limited liability company.   At relevant times, CCP Ltd. was also a hedge fund engaged in the business of timing mutual funds.   *Canary Investment Management, LLC* (**"CIM"**), is a New Jersey limited liability company with its principal offices in Secaucus, New Jersey.   At all relevant times, CIM managed the assets of CCP LLC and CCP Ltd. in exchange for a fee equal to 1.5 percent of their assets plus 25 percent of the profits above a certain threshold. As of July 2003, CIM had received approximately $40 million in management and incentive fees. The size of these fees reflects the phenomenal success Canary enjoyed

both in terms of its trading results and the amount of capital it was able to gather in the fund.

(i)     *Edward J. Stern* (**"Stern"**) is a resident of New York County, New York and at all relevant times was the Managing Principal of Canary, CCP Ltd. and CIM. Noah Lerner (**"Lerner"**) was at all relevant times an employee of Canary. Andrew Goodwin (**"Goodwin"**) was at all relevant times up to 2001 an employee of Canary.

(ii)    *CCP LLC, CCP Ltd., CIM,* and *Stern* are collectively referred to herein sometimes as **"Canary."** In September 2003, Canary reached a settlement of charges filed against it by the Attorney General of the State of New York.

(d)     *Pritchard Capital Partners LLC* (**"Pritchard"**), a Louisiana limited liability company, is a registered investment adviser and Broker-Dealer headquartered at 2001 Lakeshore Drive, Mandeville, Louisiana. Pritchard was an active participant in the unlawful scheme alleged herein.

(e)     *Trautman Wasserman & Company, Inc.* (**"Trautman"**), a Delaware corporation, is a registered investment adviser and Broker-Dealer headquartered at 500 Fifth Avenue, Suite 1440, New York, New York. Trautman was an active participant in the unlawful scheme alleged herein.

(f)     *Samaritan Asset Management Services* (**"Samaritan"**) is a Barrington, Illinois based hedge fund founded by Edward Owens. Samaritan is being investigated by, and has received subpoenas from, the Illinois Secretary of State in connection with its market timing of mutual fund shares. Samaritan was an active participant in the unlawful scheme alleged herein. *Edward Owens* (**"Owens"**) is the founder and principal of Samaritan. Owens founded Samaritan about March 1996. By

1997, the company made $600,000. In 1998 Samaritan made $6-7 million and in 1999 nearly $10 million. Owens was an active participant in the unlawful scheme alleged herein. Owens and Samaritan are collectively referred to as "**Samaritan**."

(g)     *Pentagon Asset Management* (**"Pentagon"**) is a hedge fund based in the United Kingdom, and was a client of Prudential since at least March 2000. Pentagon timed the Van Kampen Funds through Prudential and also BOA and BAS.

(h)     *Headstart Advisers Ltd.* (**"Headstart"**) is a hedge fund in the United Kingdom, and was a client of Prudential since at least July 1999. Headstart timed the Van Kampen Funds through Prudential and also BOA and BAS.

29.     [Intentionally left blank.]

30.     [Intentionally left blank.]

31.     [Intentionally left blank.]

32.     The **"Nominal Defendants"** are as follows:

(a)     *Nominal Defendant, the Van Kampen Equity Trust*, is a Delaware Statutory Trust, registered under the ICA as a diversified management company acting pursuant to a Declaration of Trust dated May 10, 1995.

(b)     *Nominal Defendant, the Van Kampen Equity and Income Fund*, is a Delaware Statutory Trust, registered under the Investment Company Act as an open-ended diversified management company acting pursuant to a Declaration of Trust dated June 21, 1995.

(c)     *Nominal Defendants the Trusts* are open-end, diversified registered investment companies under the ICA. Each Van Kampen Mutual Fund is a series of shares of one of the Trusts. The Trusts are organized either as corporations or trusts, and are listed below with state and type of organization in parentheses:

Van Kampen U.S. Government Trust (DE Trust)
Van Kampen Tax Free Trust (MA Trust)
Van Kampen Trust (DE Trust)
Van Kampen Equity Trust (DE Trust)
Van Kampen Equity Trust II (DE Trust)
Van Kampen Pennsylvania Tax Free Income Fund (PA Trust)
Van Kampen Tax Free Money Fund (MA Trust)
Van Kampen Comstock Fund (DE Trust)
Van Kampen Corporate Bond Fund (DE Trust)
Van Kampen Emerging Growth Fund (DE Trust)
Van Kampen Enterprise Fund (DE Trust)
Van Kampen Equity and Income Fund (DE Trust)
Van Kampen Limited Duration Fund (DE Trust)
Van Kampen Government Securities Fund (DE Trust)
Van Kampen Growth and Income Fund (DE Trust)
Van Kampen Harbor Fund (DE Trust)
Van Kampen High Income Corporate Bond Fund (DE Trust)
Van Kampen Pace Fund (DE Trust)
Van Kampen Real Estate Securities Fund (DE Trust)
Van Kampen Reserve Fund (DE Trust)
Van Kampen Tax Exempt Trust (DE Trust)
Van Kampen Series Fund, Inc. (MD Corporation)

(d)     *Nominal Defendants the Van Kampen Mutual Funds* are commonly known as mutual funds and are each organized as a series of shares of one of the Trusts.

(e)     The Nominal Defendants collectively listed on Exhibit A are referred to together as the "**Funds**" or "**Van Kampen Funds**."

## IV.   STATEMENT OF FACTS

A.      **General Factual Allegations**

(1)     **Introduction**

33.     Mutual funds enable small investors to invest long-term capital in the stock and bond markets.   Specifically, mutual funds were intended to enable small investors to (a) accumulate diversified stock portfolios for retirement or other long-term investing with smaller amounts of capital than otherwise would be required for such

investing, (b) avoid the transaction costs that ordinarily accompany stock and bond trades, and (c) utilize the services of professional investment advisers whose services otherwise would not be available at affordable prices.

34.     Investors contribute cash, buying shares in the mutual fund, the number of which is directly proportionate to the amount of the investment.  Mutual fund shares are issued pursuant to prospectuses that must comply with the Securities Act of 1933 and the Investment Company Act.  The investor's cash is then used by the mutual fund to purchase such securities as are consistent with the stated investment goals and objectives of the mutual fund in the Prospectus.

35.     Mutual funds typically hold no assets other than cash and the securities purchased for the benefit of their shareholders and engage in no investment activities of their own.

36.     Mutual funds typically have no employees.  Although funds may have officers, the portfolio managers and all of the officers are employees of the investment adviser.  The adviser "sponsors" the funds and as a practical matter is responsible for the initial creation of the funds and creating new funds in the series.

37.     The Funds are each created pursuant to substantially identical Declarations of Trust (**"Declaration"**) or Articles of Incorporation.  The beneficial interests in the assets of the Trusts that are organized as business trusts are held by the Trustees and are "divided into transferable shares," and "so far as practicable", trust business is conducted in the trust's name and shareholders are the trust's beneficiaries. *See e.g.* Van Kampen Equity Trust Declaration of Trust dated May 19, 1995.  §§1.1, 1.3.  Likewise, the Articles or Incorporation for Trusts that are organized as corporations typically permit their Trustees to issue different classes of shares, which are deemed portfolios and further sub-

divided into classes for each portfolio. The Articles of Incorporation typically provide that consideration received by the Corporation for the issue or sale of stock of each class, together with all income, "shall belong to the class of shares of stock ... and shall be so handled upon the books of account of the Corporation." See e.g. Van Kampen Series Fund, Inc. Articles of Incorporation dated October 5, 1995. § 4, paragraph 6. Thus, *the Van Kampen Funds* are little more than accounting entries for the Trusts. With respect to Investment Company assets and liabilities, certain assets (and corresponding liabilities) are specific to a Fund and are treated as "belonging to" a particular Series. Other assets (and liabilities) are "General Items" which the Trustees "*shall allocate . . . to and among one or more of the Series . . . in such manner and on such basis as they in their sole discretion deem fair and equitable . . .*" *See e.g.* Van Kampen Equity Trust Declaration of Trust dated May 19, 1995 §6.1(e). (emphasis supplied).

38.     The Trusts contract with an adviser or manager to handle the day-to-day operations of the Funds including making investment decisions, although the Trustees retain ultimate responsibility for the fund. The adviser or the trust will enter into contracts with other entities, which in almost all instances are affiliates of the adviser, for investment advisory servicing (adviser, sub-adviser), selling or underwriting (distributors), shareholder relations and other back-office services (administrator, transfer agent). Each of these affiliates typically will be paid a percentage of the adviser's fee, a percentage of the assets under management, or a transaction fee from the Net Asset Value of the fund.

39.     Mutual fund advisers charge and collect substantial management, administration, marketing and distribution, and other fees and compensation from the funds as a percentage of assets under management. Mutual fund advisers have a direct

economic incentive to increase the amount of assets in the funds, and thus their own fees and compensation.

40.     Each of the Funds is created and sponsored by the VKAM or its parent companies and to be managed under the supervision of the Trustees. Fund shares in all Trusts are sold to retail investors under the Van Kampen name. The meetings for all the Funds occur at or about the same time. Each of the Funds has the same adviser (directly or indirectly), the same Distributor, the same Transfer Agent and shareholder servicing agent. The agreements between the Funds and each of these entities are substantially identical form agreements, with only minor differences. As noted above, in many instances, for general assets and liabilities, the Funds share costs among themselves. In substance, all the Funds in each Investment Company are operated as a single *de facto* entity trading under a single commercial brand. Plaintiff therefore brings this action as a derivative action on behalf of the entire family of Van Kampen Funds, as well as on behalf of the Trusts and the particular Funds in which he invested.

### (2)     NAV Pricing

41.     Mutual fund shares are priced once each day, usually following the close of financial markets in New York at 4:00 p.m. Eastern Time. The price, known as the Net Asset Value ("NAV"), reflects the closing prices of the securities in a particular fund's portfolio, plus the value of any uninvested cash that the fund manager maintains for the fund and minus any expenses accrued that day. Although mutual fund shares are bought and sold all day long, the price at which the shares trade does not change during the course of the day. Orders placed any time up to 4:00 p.m. are priced at that day's NAV, and orders placed after 4:00 p.m. are priced at the next day's NAV. This practice is known as "forward pricing" and has been required by law since 1968.

42.     Because NAV is set just once at 4:00 p.m. every day under the forward pricing rule, each day's NAV is inefficient.   This is because the NAV has not incorporated the material information affecting the prices at which the underlying securities will trade by 4:00 p.m.  Thus, the prices at which mutual funds trade are often "stale."  In addition, mutual fund prices do not always reflect the true value of the stocks or bonds, especially thinly-traded securities or securities with high price volatility, but low trading volume, such as especially mid-cap, small-cap, and sector stocks, or high-yield and municipal bonds.

43.     Forward pricing gives rise to a number of manipulative practices, all of which may be characterized as "market timing."  These manipulative practices exploit the inefficiency of forward pricing in a number of ways involving short-term "in-and-out" purchases and redemptions of mutual fund shares that are "timed" to precede small movements in the market prices of the securities in which a fund invests before the NAV reacts to the price changes.

**(3)     <u>Market Timing Transactions</u>**

44.     Market timing transactions are frequently referred to as "round trips," because market timing involves a purchase made in anticipation of a near-term price increase that will trigger a quick sale.  For example, in the case of international funds that are inefficiently priced because, as a result of domestic and foreign markets operating at different times, the last-trade prices in the foreign markets have not yet incorporated movements in the United States markets, the round trips will occur within a short time frame, often within one or two days.  In other cases, such as bond funds – where the price inefficiency lasts longer because the information that causes the security to be re-valued

takes longer to be disseminated by the financial markets – the duration of the round trip will be slightly longer.

45.     Market timing frequently includes or consists of "late trading," in which market timers are permitted to purchase or sell mutual fund shares after the close of trading but at the same prices as other investors who must trade the shares during the day to get that day's NAV.

46.     Market timers employ a variety of trading strategies to profit from small increases in the market prices for stocks and bonds in which the mutual funds invest by purchasing mutual fund shares before increases in the underlying securities affect the fund's NAV and redeeming fund shares after the NAV has risen.

47.     Many market timers purchase mutual funds when trading models that analyze performance trends indicate that prices of the underlying securities (and consequently the fund's NAV) will rise in the short-term.  For example, when a market timer's trading model indicates that the stocks of companies with small market capitalization will rise in the short term, the trader acquires small cap mutual fund shares in order to capture the benefit of the price rise.  The market timer who purchases small cap fund shares then redeems those shares once the predicted rise occurs.

48.     By purchasing and selling mutual fund shares, rather than the underlying small cap stocks, market timers avoid transaction costs such as commissions on each purchase and sale of stock, which costs are borne by the fund itself.

49.     Another market timing scheme is designed to take advantage of the fact that some NAVs are calculated using "stale" prices for the securities in the Fund's portfolio.  These prices are "stale" because they do not necessarily reflect the "fair value" of such securities as of the time the NAV is calculated.

50.     One type of stale price market timing is "time zone arbitrage," which takes advantage of the fact that funds consisting primarily of foreign securities may calculate NAV based on stale prices.  A typical example is a U.S. mutual fund that invests in Japanese securities.  Because of the time zone difference, the Japanese market closes at 2:00 a.m. New York time.  When the NAV is calculated at 4:00 p.m. in New York, it is based upon market information that is fourteen hours old.   If there have been positive market moves during the New York trading day that will cause the Japanese market to rise when it opens later, the stale Japanese prices will not reflect the price change and the fund's NAV will be artificially low.  A trader who buys the Japanese fund at the "stale" price is virtually assured of a profit that can be realized the next day by selling those same shares once the NAV is adjusted to reflect the price increase.

51.     Predictable next-day price changes in foreign securities are not exploitable by trading in the securities themselves because those shares tend to re-price as soon as trading resumes the next day.  By the time a trader can buy the securities, the market price has risen to reflect the new information.  However, market timers can exploit the pricing of mutual fund shares because the funds are not re-priced in response to information that becomes available while the foreign market is closed until the following day, effectively allowing market timers to buy stock at yesterday's prices.

52.     Another market timing scheme seeks to take advantage of inefficiency in the pricing of certain municipal, corporate, and mortgage bonds.  These bonds are not efficiently priced by the market, and consequently their prices tend to lag the prices at which more efficiently priced bond futures trade.  Market timers exploit this phenomenon by purchasing (or selling) shares of a municipal bond fund that invests in such bonds on days when the prices for bond futures rise (or fall), and do so at "stale" prices.  Market

timers employing this trading scheme sell (or purchase) these mutual fund shares a day or two later once the prices of the bonds have "caught up" to the prices of the bond futures, thus earning huge profits with little or no corresponding risk.

53.    Yet another market timing scheme is "liquidity arbitrage." Under this scheme, a trader seeks to take advantage of stale prices in certain infrequently traded investments, such as high-yield bonds or the stock of small capitalization companies. The fact that such securities may not have traded for hours before the 4:00 p.m. closing time can render the fund's NAV stale, and thus open it to being timed.

### (4)    Late Trading

54.    Because of forward pricing, mutual funds are also susceptible to a manipulative practice known as "late trading." Late trading, either in conjunction with market timing or as a separate manipulative trading scheme, is the unlawful practice of allowing some investors to purchase or redeem mutual fund shares after 4:00 p.m. at that day's NAV, even though such after-hours trades should be priced at the next day's NAV.

55.    Late traders seek to take advantage of events that occur after the close of trading, such as earnings announcements, by purchasing shares of mutual funds on good news or redeeming shares on bad news at prices that do not reflect those events and are therefore under- or over-valued, respectively. "Late trading can be analogized to betting today on yesterday's horse races."[5]   The manipulative device virtually eliminates investment risk.

56.    The late trader's arbitrage profit comes dollar-for-dollar out of the mutual fund that the late trader buys or redeems. When the late trader redeems his shares and

---

[5] *State of New York v. Canary Capital Partners et al.*, Supr. Ct. of N.Y., ¶ 10 ("NYAG Complaint").

claims his profit, the mutual fund manager has to either sell stock or use cash on hand – stock and cash that belong to the fund and its shareholders and would otherwise remain invested – to give the late trader his gain.  The late trader's profit is revenue withheld from the mutual fund.  The forward pricing rule was enacted to prevent precisely this kind of abuse.  See 17 C.F.R. §270.22c-1(a).

57.     Late trading can be accomplished in at least two different ways.  The first way market timers are able to trade late is by making arrangements with a mutual fund adviser or a third-party intermediary who has made arrangements with a mutual fund adviser to have access to a trading terminal after the close of trading at 4:00 p.m. each day.  Defendant BAS provided trading terminals to at least three broker-dealers that engaged in market timing and Canary– in effect, making them branch offices of BAS, but unencumbered by BAS's obligation to adhere to the forward pricing rule – giving them the ability to place orders for mutual fund shares as late as 6:30 p.m. Pacific Time, more than five hours after the financial markets closed in New York each day.

58.     Market timers are also able to trade late by making arrangements with intermediaries, such as broker-dealers, trust companies, and other clearing agents, to combine the market timers' trades with other mutual fund purchases or redemptions each day, which are processed as batch orders.  These intermediaries net purchases against redemptions, and submit the net orders to a mutual fund's transfer agent through the Mutual Fund Settlement, Entry and Verification Service ("FundSERV"), an automated system operated by the National Securities Clearing Corporation ("NSCC"), the only registered clearing agency that operates an automated system for processing mutual fund orders.

59.    Although orders must be submitted to the intermediary broker-dealers, banks, and retirement plans before 4:00 p.m. eastern time, SEC rules permit those intermediaries to forward the order information to FundSERV or transfers agents at a later time.  Often intermediaries process orders in the early evening.  The entire process, ending in processing of orders by the transfer agent, is typically completed in the middle of the night.

60.    Late traders have found numerous ways to exploit the forward-pricing regime to their advantage.  For example, some intermediaries allowed certain preferred investors to place orders after the 4:00 p.m. cutoff, but before orders were submitted to transfer agents.  These intermediaries sometimes blended late trades with legitimate trades in the net order information submitted to FundSERV in order to conceal the late trading.  In other cases, late traders placed orders before the 4:00 p.m. cutoff, but were permitted to cancel or retract the orders after 4:00 p.m.  Similarly, some intermediaries have permitted late traders to alter orders after 4:00 p.m.  Finally, some late traders were given trading platforms, integrated hardware-software systems that allowed them to trade mutual fund shares directly without using an intermediary to submit orders to FundSERV.  In some cases fund managers themselves permitted and aided late trading by fund investors.

61.    Late traders were not necessarily restricted to trading in any single fund family through these schemes. Often intermediary broker-dealers sell shares of many different fund families through "Supermarkets."  It is not unusual for a single Supermarket to offer thousands of mutual funds.  By gaining access to the trading platform of a fund Supermarket, a market timer could late trade all of the funds in that

Supermarket. Likewise, a market timer could late trade many different mutual funds through agreements with broker-dealers who operate a fund Supermarket.

62.    Market timing was not limited to third parties who acted either alone or in complicity with intermediaries to time mutual funds. Fund insiders, like advisers, managers, and portfolio managers, sometimes unfairly availed themselves of the opportunity that market timing provided for quick profits at the expense of the mutual funds.

### (5)    Mutual Fund "Short Selling" Strategy

63.    A corollary to market timing used by some investors pursuing market timing strategies involved shorting the underlying securities that make up a fund portfolio. Using this technique timers were able to profit in both rising and falling markets. Generally, fund managers do not disclose the portfolio holding information of the funds they manage. Although this information is disclosed in semi-annual and annual reports, the information is not current when it becomes publicly available. In fact, portfolio managers are generally protective of this information and will not disclose it to individual investors and fund trackers like Morningstar. However, some fund insiders provided detailed information regarding the portfolio holdings of funds to market timers. The market timers could then buy the fund and simultaneously sell short[6] a basket of stocks that mirrored the fund's holdings, leaving the timer overall market neutral. If the value of the underlying securities increased, the timer would sell the shares of the fund earning a quick profit. When the value of the underlying securities decreased the timer would close out the short position, again earning a quick profit. By working with

---

[6] Short selling involves selling a security that the seller borrows on the assumption that the value of the security will drop and the short seller will be able to replace the borrowed security at a lower price than the price the short seller sold it for.

derivative dealers to create "equity baskets" of short positions that mimicked the effect of shorting every stock in the mutual fund, a timer can reduce transaction costs associated with this strategy.   Often the derivative dealers who assisted timers in creating short baskets were affiliates of banks that were loaning money to timers for timing purposes.

**(6)**      **Market Timing Is Easy to Detect and Has Been Well-Known Since 1997**

64.     Market timing in mutual funds has occurred at least since the late 1980s. During the 1980s and 1990s, a number of papers and reports were published by the media, by scholars, and by market timers themselves that described various market timing schemes and discussed the adverse impact of market timing on mutual funds.  The mutual fund industry became aware of potential problems from stale prices as early as 1981 by virtue of the Putnam International Equities Fund No Action Letter, Fed. Sec. L. Rep. ¶ 76,816, 1981 WL 25522 (Feb. 23, 1981), which explicitly discussed the question of whether pricing methods used by United States international funds properly could reflect the "fair value" of underlying assets given that different nations' markets close at different times.

65.     Prior to September 3, 2003, market timing and late trading had become common practice.  For example, a website called www.hedgefund.net listed hedge funds whose trading strategy was mutual fund market timing.

66.     In 2000, the Society of Asset Allocators and Fund Timers, Inc. ("SAAFTI") held a conference in Chicago attended by brokers and capacity consultants who secured and offered negotiated timing capacity in mutual funds and in annuities that held mutual funds.  The meeting was attended by the investment advisers of many mutual fund families who were there for the specific purpose of soliciting timing business from the brokers and consultants.

67.     Mutual fund managers, including investment advisers and portfolio managers, were at all relevant times aware of market timing (including late trading) and the deleterious impact of market timing (including late trading) on mutual funds and fund performance.   Some mutual fund managers adopted measures ostensibly to prevent or deter market timing and late trading, such as redemption penalties.

68.     Fund managers were able to detect timing transactions in their funds through well-developed mechanisms, such as tracking the number of buy-sell orders, or "round trips," in a single account or monitoring the size of transactions to determine if a trader was a timer.   The fund manager could then exercise discretion to refuse to execute trades on that account, forcing the timer to resort to the subterfuge of multiple accounts or multiple brokers.   These subterfuges frequently required the assistance of third party intermediaries to execute trades for the timer in such a fashion that the timing might go undetected.

69.     However, mutual fund managers, including investment advisers and portfolio managers, permitted or encouraged market timing and late trading, notwithstanding the deleterious impact of market timing and late trading on mutual funds and fund performance, and despite the measures they adopted ostensibly to prevent or deter market timing and late trading, including redemption penalties, because they profited handsomely from market timing and late trading and the arrangements they made with market timers and late traders.

70.     Market timing is easy to detect through shareholder turnover data.   A ratio of the number of shares redeemed to the number of shares outstanding is a useful means of detecting and identifying market timing in mutual funds.   Because timers make frequent "round trips," when a timer is active in the fund, the number of shares redeemed

greatly exceeds the number of shares that ordinarily would be redeemed in the absence of market timing.

71.    A fund that has not been timed will have a low ratio of redemptions-to-shares outstanding, whereas a fund that has been timed will have a much higher ratio of redemptions-to-shares outstanding.  Timed funds have redemption ratios as many as five, ten, or even 100 or more times higher than the redemption ratios for funds that are not timed.

(a)    For example, the Vanguard Funds[7] have a Timing Ratio of 10-19%.

(b)    A sample selection of the Timing Ratio of the Van Kampen Funds during the relevant time period demonstrates the frank probability of market timing activity.  The chart below demonstrates the significant turnover in certain Van Kampen Funds:

---

[7] Vanguard Group was selected as the control because of their well-recognized record for preventing market timing.

| FY End | Fund | Redeemed | Total | Timing Ratio |
|--------|------|---------:|------:|-------------:|
| 6/30/2002 | Van Kampen Asian Equity A | 33,583,855 | 4,331,852 | 775.2771% |
| 6/30/2002 | Van Kampen European Value Equity A | 2,382,391 | 422,210 | 564.2668% |
| 6/30/2000 | Van Kampen Asian Growth A | 19,346,665 | 5,839,478 | 331.3081% |
| 6/30/2002 | Van Kampen Emerging Markets A | 22,279,193 | 8,830,669 | 252.2934% |
| 8/31/2003 | Van Kampen Technology A | 49,042,951 | 31,873,469 | 153.8676% |
| 6/30/2000 | Van Kampen International Magnum A | 6,047,347 | 4,023,896 | 150.2859% |
| 3/31/2003 | Van Kampen High Yield A | 44,232,268 | 38,219,875 | 115.7311% |
| 6/30/2000 | Van Kampen Emerging Markets A | 8,010,633 | 7,942,708 | 100.8552% |
| 6/30/2002 | Van Kampen Asian Equity C | 1,576,717 | 1,847,326 | 85.3513% |
| 3/31/1999 | Van Kampen Aggressive Growth A | 11,356,554 | 14,154,257 | 80.2342% |
| 3/31/2002 | Van Kampen High Yield A | 22,077,692 | 31,144,242 | 70.8885% |
| 6/30/2002 | Van Kampen Emerging Markets C | 1,367,612 | 2,106,409 | 64.9262% |
| 6/30/2000 | Van Kampen International Magnum C | 521,018 | 987,453 | 52.7638% |
| 8/31/1999 | Van Kampen Corporate Bond B | 4,206,917 | 8,286,570 | 50.7679% |
| 3/31/2001 | Van Kampen High Yield B | 6,329,903 | 12,848,463 | 49.2658% |
| 3/31/2003 | Van Kampen High Yield C | 1,933,529 | 3,945,618 | 49.0045% |
| 3/31/2004 | Van Kampen Small Cap Value A | 6,113,056 | 12,575,069 | 48.6125% |
| 3/31/2001 | Van Kampen High Yield C | 967,441 | 2,044,273 | 47.3245% |
| 3/31/2002 | Van Kampen High Yield B | 6,225,045 | 13,807,989 | 45.0829% |
| 6/30/2000 | Van Kampen Asian Growth B | 1,473,492 | 3,687,316 | 39.9611% |
| 3/31/2001 | Van Kampen High Yield A | 11,286,372 | 28,643,145 | 39.4034% |
| 6/30/2000 | Van Kampen Asian Growth C | 1,203,170 | 3,142,243 | 38.2902% |
| 3/31/2002 | Van Kampen High Yield C | 1,165,758 | 3,104,234 | 37.5538% |
| 8/31/1999 | Van Kampen Corporate Bond C | 746,885 | 2,196,756 | 33.9995% |
| 3/31/2003 | Van Kampen High Yield B | 5,310,124 | 15,855,977 | 33.4897% |
| 8/31/1999 | Van Kampen Corporate Bond A | 8,495,350 | 26,483,965 | 32.0773% |
| 6/30/2002 | Van Kampen European Value Equity B | 135,702 | 453,394 | 29.9303% |
| 6/30/2000 | Van Kampen Emerging Markets C | 745,457 | 2,591,008 | 28.7709% |
| 6/30/2002 | Van Kampen Asian Equity B | 673,012 | 2,364,111 | 28.4679% |
| 6/30/2002 | Van Kampen Emerging Markets B | 1,229,670 | 4,379,756 | 28.0762% |
| 6/30/2000 | Van Kampen International Magnum B | 989,365 | 3,619,532 | 27.3341% |
| 8/31/2003 | Van Kampen Technology C | 3,071,460 | 11,393,147 | 26.9588% |
| 6/30/2000 | Van Kampen Emerging Markets B | 1,291,562 | 4,894,844 | 26.3862% |
| 6/30/2002 | Van Kampen European Value Equity C | 44,182 | 179,396 | 24.6282% |
| 3/31/2004 | Van Kampen Small Cap Value C | 661,738 | 2,762,301 | 23.9560% |
| 8/31/2003 | Van Kampen Technology B | 10,222,198 | 45,368,129 | 22.5317% |
| 3/31/2004 | Van Kampen Small Cap Value B | 1,842,840 | 8,534,501 | 21.5928% |
| 3/31/1999 | Van Kampen Aggressive Growth C | 315,445 | 1,632,921 | 19.3178% |
| 3/31/1999 | Van Kampen Aggressive Growth B | 2,191,661 | 13,840,712 | 15.8349% |

72.    Mutual fund managers, including advisers and portfolio managers, routinely monitored mutual fund redemption rates using a variety of mechanisms of detection that were well-developed, and thus were aware of, or recklessly disregarded indications of, market timing in the form of higher than normal redemption rates.

73.    By 1997, market timing in mutual funds was well-known and well-documented.  During October, 1997, Asian markets were experiencing severe volatility. On Tuesday October 28, 1997, the Hong Kong market index declined approximately fourteen percent, following the previous day's decline on the New York stock market. Later on Tuesday the 28th, the New York markets rallied.  Knowing that the Hong Kong market would rebound the next day, U.S. mutual funds invested in Hong Kong securities were faced with the dilemma whether to calculate NAV based on Tuesday's depressed closing prices in Hong Kong, or whether to calculate their NAV based on another method.  Several mutual fund companies determined that the closing prices in Hong Kong did not represent "fair value" and used an alternate method to calculate NAV. Some investors (presumably market timers) who had expected to profit from the large price swings went so far as to complain to the SEC when Fidelity used fair value pricing.

74.    On November 5, 1997 the Wall Street Journal published an article by Vanessa O'Connell describing some of the responses by mutual funds to the October market turmoil.  See Mutual Funds Fight the 'Market Timers,' Wall St. J., 11/5/97, C1. For example, the article described a "stock-market correction trading activity" policy announced by the Dreyfus mutual funds immediately following the drop and subsequent rebound of stock prices on October 28, 1997, which permitted Dreyfus to take an

additional day to complete exchanges placed by telephone during a "severe market correction" in order to prevent harm to those funds from market timing.

75.     The SEC's investigation of fund companies' responses to the October, 1997, turmoil revealed that funds that used fair value pricing experienced less dilution than those that used market quotations.  Further, the number of investors who attempted to take advantage of the arbitrage opportunity was "fairly large."  *See* Barry P. Barbash, *Remembering the Past: Mutual Funds and the Lesson of the Wonder Years*, 1997 ICI Securities Law Procedures Conference (Dec. 4, 1997).

76.     By 2001, academic research estimated that between February 1998 and March 2000 market timing caused dilution damages exceeding $420 million in a sample of only approximately 20 percent of the international funds then available to U.S. investors.  *See* Jason T. Greene & Charles W. Hodges, *The Dilution Impact of Daily Fund Flows on Open-End Mutual Funds*, Journal of Financial Economics 131 (July 2002).

77.     One recent study estimated that U.S. mutual funds lose over $4 billion per year to timers.  *See* Eric Zitzewitz, *Who Cares About Shareholders?  Arbitrage-Proofing Mutual Funds*, Journal of Law, Economics & Organization 19:2 (Fall 2003), 245-280.

78.     By 2002 specialty firms began marketing fair value pricing programs to assist mutual fund companies in reducing arbitrage opportunity in international funds. These firms provide programs to mutual funds that eliminate arbitrage opportunity by bringing stale prices in international securities up to date as of the time when NAV is calculated.   One firm, ITG, now offers a Fair Value Model providing "fair value adjustment factors for over 34,000 stocks in 43 markets outside the U.S."  See http://www.itginc.com/research/fvm.html.

### (7)     Market Timing Arrangements

79.     Most market timing (including substantially all late trading) in mutual funds took place through negotiated written or oral agreements giving market timers authority to trade certain amounts within a given mutual fund family or a number of fund families.   The authority to time mutual funds is known as "capacity."   Market timing became so widespread that many mutual fund advisers operated "timing desks" to service market timers.

80.     Timers, the intermediaries, and the Funds' managers and advisers entered into *specific negotiated agreements* to permit timing of certain funds in a fund family, often with prominent financial institutions lending money to timers to effect the trading and monitoring the trades.   Through the misuse of sophisticated computer equipment used for clearing mutual fund trades, market timing soon morphed into late trading, a practice which *guarantees* profits.

81.     Mutual fund advisers, distributors, and their affiliates, whose fees are a percentage of fund assets, profited from capacity arrangements that encouraged market timing, as well as from timing "under the radar," by charging and collecting fees on the money deposited by market timers in the mutual funds.

82.     Market timers frequently offered mutual advisers, distributors, and their affiliates static, non-trading assets, called "sticky assets," in exchange for the right to time.   In other cases, timers simply moved their money between timed mutual funds and money market funds in the same fund family, thereby earning additional fees for the mutual advisers, distributors, and their affiliates.

83.     As Stephen M. Cutler, the Director of the SEC's Division of Enforcement, testified on November 3, 2003 before the Senate Subcommittee on Financial

Management, the Budget, and International Security, Committee on Government Affairs:[8]

> **About half of the fund groups appear to have some kind of agreement or arrangement with frequent traders:** 50% of responding fund groups appear to have one or more arrangements with certain shareholders that allow these shareholders to engage in market timing - i.e., these shareholders have been given "market timing capacity." The market timing of persons with these arrangements appears to be inconsistent with the groups' policies, and in some cases, the fund groups' prospectus disclosures and/or fiduciary obligations. We are aggressively following up on these arrangements.

> **Quid pro quo arrangements:** Although the information provided in this area is limited, it appears that many of the person proposing a special arrangements to get market timing space offered to invest so-called "sticky" or long-term assets in one or more funds in the complex. In most of the situations where sticky assts were discussed, the funds in which these assets were to be invested were not the same funds to be market timed by the person involved in the arrangement.

84.    Market timers obtained capacity either directly through mutual fund advisers, distributors, and their affiliates, or indirectly through broker-dealers or other timers.   Many fund families had "Anchor Brokers" or "Anchor Timers," who were designated broker-dealers or timers who had timing capacity agreements with a fund's adviser or its affiliates, and who doled out market timing "capacity" to timers.

85.    Negotiated market timing arrangements often involved other financial institutions as participants in the timing schemes, and those financial institutions (such as banks and brokerage firms) had other business relationships with the mutual funds that

---

[8] *Testimony Concerning Recent Commission Activity To Combat Misconduct Relating to Mutual Funds: Hearing Before the Senate Subcommittee on Financial Management, the Budget, and International Security, Committee on Governmental Affairs*, 108th Cong. (Nov. 3,2003) (testimony of Stephen M. Cutler, Director, Division of Enforcement, U.S. Securities & Exchange Commission).  Mr. Cutler offered the same testimony on Nov. 4, 2003, before the *House Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises, Committee on Financial Services.*

encouraged the funds to accommodate the other financial institutions as well as the market timers.

86.    Banks who financed market timing negotiated loans and swaps that provided market timers with leverage at exorbitant rates to time and late trade mutual fund shares as well as short equity baskets.    The banks entered these financing arrangements knowing that the loans would be used for market timing, late trading, and short baskets.    The financing consisted of loans for market timing and late trading, and swaps for shorting.    The collateral for the loans were mutual fund shares, so the banks followed trading closely to ensure that their loans were fully secured.    Under swap arrangements, the swaps are in the bank's name as account holder, in which event the market timer manages the money, pays interest to the bank, and keeps the profit. Defendant CIBC providing financing to certain hedge funds to time and late trade the Funds.

87.    Broker-dealers and other intermediaries who offered timing capacity received remuneration from both the mutual funds themselves and the market timers to whom they allocated capacity.

88.    Distributors and other service agents who permitted timing also benefited by receiving increased fees based on the money deposited into the mutual funds for market timing purposes.    Distributors often receive fees based on assets under management and may earn commissions on sales of fund shares.    Such fees, known as "12b-1 Fees," are paid pursuant to a plan adopted by mutual funds under Rule 12b-1 promulgated by the SEC under the ICA for marketing and distributing mutual fund shares.    Rule 12b-1 permits a mutual fund to pay distribution-related costs out of fund assets, provided that the fund adopts "a written plan describing all material aspects of the

proposed financing of distribution," which must include an express finding that the fees paid will result in a net economic benefit to the funds. 17 C.F.R. ¶ 240.12b-1.

89.    Intermediaries who facilitated market timing also received "wrap fees" from market timers. Wrap fees are customarily charged to investors as a single fee for a variety of investment services, such as commission trading costs and fees of an outside money manager. Wrap fees are charged as a flat percentage of assets rather than on a transaction-by-transaction basis. The name refers to the fact that these charges usually "wrap" a variety of investment services into a single fee – usually from 1 to 3 percent of assets. Broker-dealers who offered timing capacity to market timers often charged a percentage of assets that they termed a "wrap fee," even though the brokers did not generally give investment advice.

90.    Typically, 12b-1 Fees are deducted from fund assets and paid to the fund's primary distributor, usually an affiliate of the adviser. Distributors usually pay a portion of those 12b-1 Fees to the broker-dealers who sell fund shares. The broker-dealers continue to receive 12b-1 fees for as long as their client's money is invested in the funds. However, broker-dealers who offered timing capacity often received 12b-1 Fees directly from the funds themselves, which were paid in addition to the 12b-1 fees paid to the mutual fund distributors.

91.    Negotiated capacity arrangements by market timers also facilitated late trading through a variety of manipulative schemes. For example, market timers frequently traded through third parties, i.e., broker-dealers or other intermediaries who processed large numbers of mutual fund trades every day through omnibus accounts where net trades are submitted to mutual fund companies en masse. By trading this way,

market timers evaded detection of their activity amid the other trades in the omnibus accounts. This is one example of market timing "under the radar."

92.     Timing under the radar is intended to avoid the "market timing police," a colloquial term used by market participants to describe persons employed by mutual funds ostensibly to detect and prevent market timing.     Market timing police often ignored or did not prohibit negotiated market timing, or were instructed by their superiors that certain favored investors were exempt from the restrictions.

93.     Brokers who assisted in timing under the radar employed a number of tactics to avoid detection and to continue their illicit activities if a fund took steps to prevent their timing activity. These tactics included: (a) using multiple account numbers, registered representative numbers, and branch numbers to conduct market timing trades; (b) creating and using two or more affiliated broker dealers; (c) using different clearing firms to clear trades; and (d) switching between mutual fund families.   Some market timers employed these tactics directly, without relying on an intermediary broker. Prudential Securities used some of these tactics to time and late trade the Funds.

### (8)     Banc of America Securities LLC

94.     Some time prior to late 1999, in order to facilitate late trading and timing of mutual funds by brokers and timers through BAS, BAS, in conjunction with ADP, which operates its "back office," created a special electronic trading system called "RJE" ("Remote Job Entry"), and colloquially referred to as "the box," which it provided to certain market timers and broker-dealers who acted as intermediaries for a large number of market timers.

95.     RJE is an electronic mutual fund entry order system that could be installed in different locations and was directly hooked up to ADP through a modem.  In effect, those who had the box became branches of BAS.

96.     Those market timers and broker-dealers who received the box could enter mutual fund orders at 5:30 p.m., 7:00 p.m., or 7:30 p.m. Eastern Time directly into ADP's clearing system, and therefore had the capability to buy and sell mutual fund shares at the 4:00 p.m. closing price up to 3-1/2 hours later.  BAS's standard system, called "MFRS," allowed trades to be entered as late as 5:30 p.m., but only if trade tickets were time stamped prior to 4:00 p.m.

97.     The box allowed broker-dealers and others to circumvent BAS's standard system and the 4:00 p.m. deadline for buying and selling mutual fund shares at that day's prices, in violation of the forward pricing rule.  17 C.F.R. § 270.22c-1(a).

98.     In addition, broker-dealers and others who had the box could "batch" mutual fund trades instead of executing them one at a time, which is the standard method of entering mutual fund orders through BAS.  The "batching" capability allowed brokers and timers who had the box to enter mutual fund trades en masse after the 4:00 p.m. deadline at that day's prices.

99.     Initially, the box was developed for use by the Broker-Dealer Services ("BDS") group of BAS and Aurum, a broker-dealer who was known to be extensively involved in late trading and timing mutual funds.  At the time the box was developed, BDS was not very profitable, and it hoped to increase its margins by charging a per trade fee to brokers that had access to the box.

100.    BAS installed the box in the offices of three broker-dealers who routinely late-traded and timed mutual funds on behalf of their clients and themselves.  BAS gave

the box to Aurum in around late 1999 or early 2000, to Trautman in or about early 2001, and to Pritchard in early 2003. Each of these broker-dealers was charged $10 for each trade that was entered through the box.

101.   BAS entered into clearing agreements with these brokers that, among other things, obligated them to comply with the securities laws. By virtue of these agreements, BAS sought to shift liability for its knowing violation of the forward pricing rule onto the broker-dealers.

102.   BAS also installed the box in Canary's offices in or around the summer 2001, but did not charge any fee to Canary for orders placed through the box. Rather, the Private Client Services ("PCS") group of BAS provided the box free of charge to Canary, which was not a broker-dealer, as part of a special arrangement negotiated between Stern and Theodore Siphol III ("Siphol") of PCS, under which Canary was charged a wrap fee of 100 basis points (one percent) for late trading and timing funds offered by BOA and 50 basis points (0.5 percent) for late trading and timing funds offered by other mutual fund families.

103.   On September 16, 2003, the SEC instituted an administrative proceeding against Siphol charging him with violations of the Securities Act of 1933, the Securities Exchange Act of 1934, the ICA, and the IAA for his role in enabling Canary to engage in late trading shares of mutual funds offered by BOA and other mutual fund companies. The SEC charged Siphol[9] for his facilitation of Canary's late trading "manually" and through the box. As set forth in the SEC's order:

---

[9]   Siphol was also indicted on 40 counts in connection with late trading at BOA, including a scheme to defraud in the first degree, grand larceny in the first degree, violation of the Martin Act, and falsifying business records in the first degree.

*"Manual" Late Trading at BAS*

15.     In or around May 2001, Canary began to late trade the Nations Funds. At first, Canary conducted its late trading "manually." In the manual stage, Canary was able to engage in late trading primarily because Sihpol and his team falsified BAS' books and records. Prior to 4:00 p.m. ET, a Canary trader would send Sihpol or a member of his team a series of "proposed" mutual fund trades by e-mail or facsimile. Upon receipt, Sihpol, or a member of his team acting upon his instructions, would fill out an order ticket, time stamp it, and set it to one side until that evening. Thus, Sihpol created false order tickets that made it appear as if the orders had been received prior to 4:00 p.m. ET.

16.     Sometime after 4:00 p.m. ET, a Canary trader would telephone Sihpol or a member of his team, and would either confirm or cancel the "proposed" trades. If confirmed, Sihpol's team would fax the order (with its pre-4:00 p.m. time stamp and no post-4:00 p.m. time stamp) to the clearing department for processing. As a result, Canary would receive that day's NAV. If Canary cancelled the "order," Sihpol or a member of his team would discard the ticket.

*Late Trading Through BAS' Electronic System*

17.     In the summer of 2001, BAS technicians installed the direct access system in Canary's offices. Through this system, Canary was able to enter its trades directly into BAS' clearing function until 6:30 p.m. ET.

18.     After a Canary trader entered the trades directly into the system, the trader would print out a document confirming the trades and the time (after 4 p.m.) that the trades had been entered. The trader then faxed the document to Sihpol or a member of his team. The following day, Sihpol or a member of his team would use this document to reconcile Canary's trades. Once the trades were reconciled, Sihpol or a member of his team discarded the document.

19.     From the summer of 2001 until the summer of 2003, Canary used the electronic system to late trade. Canary also late traded "manually" whenever there were technical problems with the electronic system. BAS technicians also installed a second direct access system in the residence of a Canary trader.

20.     The electronic system enabled Canary to late trade with Nations Funds and in the many other mutual fund families with which BAS had clearing agreements.   By using the electronic system, Canary was able to send orders directly to BAS' clearing function, circumventing the normal trading process in which each brokerage order must be properly documented, including the time the order was received.

21.     Canary paid BAS a so-called "wrap fee" of one percent of the Canary assets in Nations Funds and one-half of one percent of the assets in other funds traded through the electronic link.  Sihpol received a portion of this wrap fee.  In addition, Canary agreed to leave millions of dollars invested in BAC proprietary mutual funds on a long-term basis.  Canary also paid interest and other charges to BAS and its affiliates.  Canary also paid fees for the installation and maintenance of the electronic system.

104.    By March 2004, BOA admitted that, by allowing Canary and others to time and late trade mutual funds through its clearing platform, it caused harm not only to the Nations Funds, but to other mutual fund families as well:

> The Corporation has announced it will establish a restitution fund for shareholders of the Nations Funds who were harmed by Canary's late trading and market timing practices.   In addition, the Corporation announced that it will provide restitution for shareholders *of third party mutual funds who were harmed by any late trading activities by Canary that are found to have occurred through the Corporation* in the event restitution is not otherwise available from Canary, its affiliates, its investors or from any other third parties.

BOA Form 10-K for Fiscal year 2003, filed March 1, 2004 (emphasis added).

105.    On March 15, 2004, the SEC and the New York Attorney General ("NYAG") announced a $675 million joint settlement in principle with BOA and Fleet in connection with their involvement in late trading and market timing.  BOA's monetary settlement was $375 million, comprised of restitution of $250 million and penalties of $125 million (and a fee reduction of $80 million over 5 years).

106.    The SEC Press Release announcing the settlement in principle states that the $375 million "will be distributed to the mutual funds and their shareholders that were harmed as a result of market timing in Nations Funds and *other mutual funds through Bank of America*." (Emphasis added). In the same release quoted Mark Schonfeld of the SEC as saying:

> This settlement is a new benchmark in mutual fund market timing and late trading. Bank of America not only permitted timing in its own funds, *it provided the instruments for timing and late trading of numerous other funds through its broker-dealer. This settlement will ensure compensation for all victims of the harm that resulted and prevent this misconduct from happening again.*

107.    BOA's Press Release announcing the settlement states that, "subject to further discussions with the Nations Board of Trustees," approximately $25 million "would go to Nations Funds shareholders" and the remainder to shareholders of other funds that were harmed by BAS' clearing of timing trades. Thus, *BOA itself attributed $350 million of its $375 million monetary settlement to harm caused to other mutual fund families as a result of BAS' facilitation of late trading and market in other mutual fund families*.

108.    In further recognition of BAS's misconduct in facilitating late trading through the box or otherwise, the BOA's settlement with the SEC and NYAG provides that BOA will exit the securities clearing business by the end of 2004.

109.    Between late 1999 through 2003, BAS, either manually or by providing the box, allowed Aurum to late trade approximately $5.6 billion in third-party mutual funds, Trautman to late trade approximately $8.6 billion in third-party mutual funds, Canary to late trade $21.2 billion in third party mutual funds, and Pritchard to late trade approximately $4.9 billion in third party mutual funds.

**B.**     **Market Timing and Late Trading in the Van Kampen Funds**

    **(1)**     **Aurum, Pritchard, Trautman, and Their Clients' Trading Through the Box**

    110.     Aurum, Pritchard, and Trautman used the box to market time and late trade the Van Kampen Funds, among others, both for their own benefit and for the benefit of their clients.

    111.     Aurum, for its own accounts or for the accounts of its clients, made market timing and late trading purchases in the Van Kampen (1) Emerging Growth, (2) Comstock, and (3) Growth and Income Funds totaling approximately $25 million.

    112.     Pritchard, for its own accounts or for the accounts of its clients, made market timing and late trading purchases in the Van Kampen (1) Emerging markets, (2) Asian Equity, (3) Corporate Bond, (4) Municipal Income, (5) European Value, (4) U.S. Government, (5) Limited Maturity (formerly Limited Maturity Government), (6) International Magnum, (7) Global Franchise, (8) Global Equity, and (9) Government Securities Funds totaling approximately $19.3 million.

    113.     Trautman, for its own accounts or for the accounts of its clients, made market timing and late trading purchases in the Van Kampen (1) High Yield, (2) U.S. Government, (3) Technology, (4) Global Equity, (5) International Magnum, (6) Global Value, (7) Emerging Growth, and (8) Aggressive Growth Funds totaling over $144 million.

    114.     Headstart, as a client of Trautman and through the box, made market timing and late trading purchases in the Van Kampen (1) Global Value, (3) U.S. Government, and (3) Global Equity Funds totaling approximately $5.5 million.

    115.     Pentagon, as a client of Trautman and through the box, made market timing and late trading purchases in the Van Kampen (1) High Yield, (2) U.S.

Government, (3) Technology, (4) Global Equity, (5) International Magnum, and (6) Global Value Funds totaling over $65 million.

116.   Samaritan, as a client of Trautman and through the box, made market timing and late trading purchases in the Van Kampen (1) U.S. Government, (2) Emerging Growth, (3) Technology, and (4) Aggressive Growth Funds totaling approximately $10.8 million.

### (2)   Canary's Timing Activity in Van Kampen

117.   Canary timed the Van Kampen Funds at least as early as 2000.  An e-mail dated June 23, 2000 from Tim Friday ("Friday"), who appears to be a broker selling capacity, sent in response to a request from Andrew Goodwin for a list of funds trading at T+1 (next day clearing), forwards the list of funds which Friday states trade through their self-clearing platform "in a T+1 environment" and goes on to assure Goodwin that Canary can trade until 4:00 p.m. and "delete the next morning."  Goodwin had indicated an interest in a Van Kampen T+1 international or small cap fund.

118.   In another vein, on October 22, 2000, Andrew Goodwin and Edward Stern exchanged e-mails "re: guarantees" concerning certain salary or bonus arrangements for Goodwin at Canary.  Stern's e-mail said

> "No to . . . the . . . Van Kampen baskets . . . This is
> something we were doing well before you arrived here,
> though we increased its use as the end of the day became
> more and more crucial."

119.   Canary regularly timed the Van Kampen funds throughout 2001 through the Security Trust Company, another broker.  An exchange of e-mails beginning February 22, 2001, between Andrew Goodwin and Daniel Printz of Security Trust discussed the "set up" of new funds to replace Canary's lost international "capacity" and "to prepare for capital infusion" from Canary.  Included in these funds to be traded was

Van Kampen Global. E-mails with Security Trust continue throughout the first half of 2001 with requests for lists of funds available and lists sent back which regularly included Van Kampen Funds. For example on June 18, 2001, Daniel Printz sent Andrew Goodwin an e-mail stating that 23 new funds would be available for trading on June 22, 2001 *including four Van Kampen Funds with their ticker symbols.*

120.    Any doubt that the Security Trust transaction involved timing and late trading is removed by the exchange between Stefanie Gloria of Security Trust and Andrew Goodwin on August 22, 2001, where Stefanie advised Goodwin that the trading group set up five new TINS (tax identification numbers) for Canary's account and to "Ignore the names on the account, tried to get a little creative." Thus Security Trust set up multiple accounts to allow Canary to trade in large dollar amounts at once but spread over the multiple accounts.

121.    In 2001 Canary also timed the Van Kampen Funds through Atlantic Financial, a brokerage house that offered capacity on its TD Waterhouse Platform and Clearco Financial, another broker offering capacity. An e-mail from Andrew Goodwin to Carmelyn Winkler of Clearco put Van Kampen on Canary's "rotation list," a trading model with Clearco. A follow-up e-mail dated July 25, 2001 from Carmelyn Winkler to Andew Goodwin reflected that Canary had positions in their Van Kampen funds of almost $1 million each.

122.    Canary timed Van Kampen through David Byck, an independent capacity broker. An e-mail dated November 27, 2002 from Byck to Noah Lerner reads: "Here are new funds we can get for you Van Kampen Real Estate at $500,000, TICKER SYMBOL ACRX." Canary also traded Van Kampen through Roundhill Capital. An e-mail from

Kevin Brand at Roundhill to Ed Stern forwarding a list he [Brand] can offer, "includes $2 m in capacity, Van Kampen High Yield."

> **(3)**     **Timing Through Prudential**

123.    Beginning around January of 2001, and through September 2003, the Boston branch office of defendant Prudential Securities Inc. assisted clients in engaging in thousands of market timing and late trades in over 50 mutual fund companies worth over a billion dollars. The Mutual Fund Operations unit of Prudential Securities Inc. in New York assisted the Boston office by processing trades.

124.    In many instances, the Prudential Securities brokers attempted to mask market timing trades by using multiple broker account numbers and fictitious account names.

125.    The SEC and the Massachusetts Secretary of State filed civil complaints against six Prudential Securities brokers for their involvement in the scheme in July 2004. The Massachusetts Secretary of State also filed an administrative complaint against Prudential Securities Inc. in November 2004 for its failure to supervise and prevent the market timing and late trading that occurred through the Boston office.[10]

126.    The brokers in the Boston office of Prudential Securities assisted at least six hedge funds, including Headstart and Pentagon, in making market timing and late trades in the Van Kampen Funds totaling nearly $60 million.

127.    The brokers used multiple account numbers and broker numbers to mask the trades. Despite these attempts to mask the trading, the Van Kampen Defendants easily discovered the market timing activity. The Van Kampen defendants sent at least 59 letters and emails to Prudential Securities indicating that it was restricting further

---

[10] In the Matter of Prudential Securities Inc., Docket No. E-2003-075.

trading activity by the relevant brokers and their clients, and in some instances blocked certain accounts temporarily.  However, because the scheme was profitable, Prudential Securities and the Van Kampen Defendants both failed to take adequate steps necessary to prevent further market timing and late trading in the Van Kampen Funds by Prudential Securities and its clients.

128.  Senior Prudential Securities executives knew of and encouraged the market timing and late trading practices.  Further, while Prudential barred market timing in its own proprietary mutual funds, they were willing to allow the Boston brokers to market time other mutual fund families in order to increase their bottom line.  Despite numerous letters from various mutual fund companies, Prudential Securities allowed the conduct to continue.

129.  Prudential Securities, on behalf of its clients, market timed and late traded at least the Van Kampen (1) High Yield, (2) High Income, (3) Government Securities, (4) Global Equity, (5) International Magnum, (6) Strategic Municipal Income, (7) Equity and Income, (8) European Value, (9) Enterprise, (10) Small Cap Growth, (11)Growth and Income, (12) Global Franchise, (13) Limited Duration, (14) Asian Equity, (15) Emerging Markets, and (16) Corporate Bond  Funds.  The market timing and late trading in the Funds through Prudential Securities continued from at least April 2001 through July 2003.

130.  Defendant CIBC provided financing to certain of the hedge funds that market timed and late traded the Van Kampen funds through Prudential Securities, including Headstart, with full knowledge of the purpose and use of the financing.  In some cases accounts were held in CIBC's name.

**(4)    Timing Policies in the Van Kampen Funds**

131.    Throughout the duration of the market-timing scheme alleged in this

Complaint, the Funds publicly maintained policies with regard to market timers contrary

to their actual policies.  Typical of such policies is the following language from the April

2001 prospectus for the Van Kampen Equity and Income Fund:

> EXCHANGE PRIVILEGE The Fund reserves the right to reject any order to purchase its shares through exchange. In addition, the Fund and other Participating Funds may restrict exchanges by shareholders engaged in excessive trading by limiting or disallowing the exchange privilege to such shareholders.  *All shareholders are limited to eight exchanges per fund during a rolling 365-day period.* Exchange privileges will be suspended on a particular fund if more than eight exchanges out of that fund are made by a shareholder during a rolling 365-day period. If exchange privileges are suspended, subsequent exchange requests during the stated period will not be processed.  Exchange privileges will be restored when the account history shows fewer than eight exchanges in the rolling 365-day period. This policy does not apply to money market funds, systematic exchange plans or employer-sponsored retirement plans.  The Fund may modify, restrict or terminate the exchange privilege at any time. Shareholders will receive 60 days' notice of any termination or material amendment.[11]

Van Kampen Equity and Income Fund Prospectus, dated April 30, 2001, p.23 (emphasis
added).

132.    Identical language was contained in the prospectuses for other Funds,

including the January 2001 prospectus for Nominal Defendant Van Kampen Equity Trust

(known as the "Small Cap Value Fund").

133.    With respect to the Van Kampen Equity Trust, the Trustees recognized a

special need to restrict certain shareholders from abusing the exchange privilege as early

as 1999.  According to the June 1999 prospectus for the Van Kampen Equity Trust:

EXCHANGE PRIVILEGE To be eligible for exchange, shares of the Fund must have been registered in the shareholder's name for at least 30 days prior to an exchange. *Shares of the Fund registered in a shareholder's name for less than 30 days may only be exchanged upon receipt of prior approval of the Adviser. It is the policy of the Adviser, under normal circumstances, not to approve such requests.*

Van Kampen Equity Trust Prospectus, dated June 16, 1999, p. 20 (emphasis added).

134.    Identical language appears in the February 2000 and January 2001 prospectuses for Van Kampen Equity Trust. See Van Kampen Equity Trust Prospectus, dated February 4, 2000, p.21; Van Kampen Equity Trust Prospectus, dated January 31, 2001, p.21.

135.    All of the Funds had similar policies limiting exchanges and designed to prevent market timing. The Van Kampen defendants, however, selectively enforced these policies as is clear from the large amount of market timing that occurred in the Funds.

136.    [Paragraphs 137 through 251 intentionally left blank.]

### (5)    **Impact of Market Timing**

251.    Market timing and late trading are inconsistent with and inimical to the primary purpose of mutual funds as long-term investments. Mutual funds are marketed towards buy-and-hold investors, and are therefore the preferred investment instruments for many retirement and savings accounts. Nonetheless, certain market timers have been allowed to make frequent in-and-out trades to exploit the inefficiency of forward pricing and the cost structure of the mutual funds.

252.    Market timing and late trading harm mutual funds, directly and indirectly, in a variety of ways. The types of adverse impact caused to mutual funds from market

timing generally can be grouped into three categories: (a) Dead Weight, (b) Dilution, and (c) Concentration.

253.    Dead Weight losses result from frequent transactions in mutual fund shares by market timers.  Dead Weight harms not just the Funds targeted and traded by market timers, but also affects other funds in the same fund family that are not market timed.

254.    Dead Weight includes, but is not limited to, the following:

(a)    increased service agent fees, such as transfer agent, compliance administrator, custodian, portfolio accounting, shareholder servicing agent, adviser, auditor, and fund accounting fees, and other agency fees, all of which increase based on the frequency of transactions and thus increase with market timing;

(b)    statement costs (including costs of printing and postage for statements of account activity) for account statements relating to market timers' trades;

(c)    higher capital gains tax liability resulting from the sale of underlying securities to raise cash for redemption, including redemptions caused by investors who flee the fund after learning of the late trading and timing scandal;

(d)    lost investment opportunity on cash that portfolio managers must hold in reserve to redeem market timers' shares that cannot be invested in furtherance of the funds' investment strategies and objectives;

(e)    inefficient trading in the Funds' underlying portfolio securities when investment advisers must buy or sell securities at inopportune times (*e.g.*, buying shares of stock in a rising market or selling them in a declining market) to cover market timers' trades (as well as to cover the redemption of fund shares for those innocent fund

investors who have withdrawn their investments from mutual fund families implicated in the scandal);

(f)     transaction costs for transactions in the Funds' underlying portfolio securities that result from market timing (as well as from the redemption of fund shares for those innocent fund investors who have withdrawn their investments from mutual fund families implicated in the scandal), which include bid-ask spreads and brokerage fees;

(g)     interest on borrowing to maintain the mutual funds' position in the underlying portfolio securities; and

(h)     increased expenses for fixed costs (including trustee or director expenses) resulting from shareholder redemptions from mutual fund families implicated in the scandal.

255.    Market timing lowers the expected returns of mutual funds by restricting the amounts the fund portfolio managers are able to invest in furtherance of their investment strategies.  Because the money deposited into mutual funds by market timers is not expected to remain in the funds for long periods of time but is deposited and redeemed frequently, portfolio managers must keep greater uninvested cash balances in the funds than would be required to meet ordinary redemption demand in the absence of market timing.  With less cash available to invest, the net return on all fund assets (including the transient cash deposited by market timers) is lower than it would be otherwise if the managers were able to fully invest the money deposited by market timers.

256.    Dead Weight harms not only the funds that are timed, but can also harm non-timed funds.  Non-timed funds are harmed by market timing when timing increases

costs that are shared by timed and non-timed funds within the same fund family. Certain costs, for example custodian fees, are shared by all funds in a mutual fund family. Market timing in one fund can cause an increase in these costs, which is then spread across all funds in the fund family. This is true regardless of whether those fees are calculated on a transactional basis or as a percentage of assets in the funds. If fees are calculated on a transactional basis, the costs are increased directly. If fees are calculated as a percentage of assets, the relevant service agent must charge a higher percentage of assets when the agreement is renegotiated in a subsequent year in order to compensate for predicted future transactions. Any service agent fees, statement costs, transaction costs, and interest charges on borrowing that increase as a result of market timing and are shared among multiple funds cause damage to timed-funds and non-timed funds alike.

257. Non-timed funds are also harmed by market timing and late trading when large numbers of investors redeem their shares in the wake of disclosures about the schemes. En masse redemptions result in large transaction costs and increased expense ratios, which are borne by the Funds themselves.

258. Dead Weight is exacerbated when timing occurs in international and small capitalization funds because the underlying securities tend to be the most expensive to trade due to high bid-ask spreads.

259. In addition to exposing mutual funds to Dead Weight, market timers who purchase mutual fund shares on the expectation of a short-term price rise and redeem those shares at a profit also dilute the fund's assets. When a timer purchases based on an anticipated rise in the prices of the underlying securities, the portfolio manager cannot invest the timer's cash before the price of those securities rises. The timer therefore pays less than the true value of the fund share. When the underlying securities increase in

price (as anticipated), the fund's NAV increases and the timer participates in this "unearned appreciation." The timer's unearned appreciation results in dilution of the fund's NAV dollar for dollar.

260.    Dilution occurs when a market timer buys a mutual fund that has a stale price incorporated into its NAV, such as a fund invested in Japanese securities that calculates NAV based on information that is fourteen hours old. Dilution is compounded because the market timer repeatedly purchases mutual fund shares at a NAV that does not accurately reflect the value of the underlying securities.

261.    Late trading in particular dilutes the assets of a mutual fund. When a market timer places an order to purchase mutual fund shares after the 4:00 p.m. close of the financial markets, the price at which the order should be executed is the following day's higher NAV. However, late traders are able to purchase the fund shares at the current day's lower NAV, thus reducing the purchase price for the shares and depriving the funds of the NAV appreciation between the two days. Late traders recapture this saving in the form of increased profits when they subsequently redeem their mutual fund shares.

262.    Dilution occurs because the fund manager cannot invest the timer's cash at the stale price on which the NAV was calculated. In order to do so, in the example of Japanese securities, the fund manager would have to invest the timer's cash fourteen hours prior to knowing what trade is needed. The timer's cash is either invested in the underlying securities at the next day's non-stale price, or else held in cash, but in both cases the timer receives a proportionate share of the increase in NAV that results from the rising value of the underlying securities even though the timer's money was not invested when the value of the underlying securities increased. Since the timer's money is either

invested at a non-stale price or held in cash, it causes a dilution of NAV across all of the fund's shares.

263.    Concentration occurs when a market timer sells shares of the fund just prior to a negative price movement in the underlying securities.  The exploitation of the down turn in the market is the reversal of the exploitation of the up turn in the market in dilution.  The fund manager cannot liquidate the underlying securities prior to the next-day drop in prices, and instead must sell those securities at the reduced prices.  Therefore, the market timer is able to redeem shares based on a stale, inflated NAV, which concentrates the negative returns to the existing fund shares the next day.

**(6)    The Van Kampen Defendants and the Morgan Stanley Defendants Directly Benefited From the Market Timing and Late Trading**

264.    The Adviser Defendants "run" the Funds pursuant to the Investment Advisory Agreements entered into with the Funds.    The Investment Advisory Agreements provide that the Adviser Defendants receive fees as a percentage of assets under management.  These fees add up to hundreds of millions of dollars per year.  For example, the chart below shows the Investment Advisory Fees received by VKAM for the years 2000 and 2001.

| Year | Fund | Advisory Fee |
|------|------|-------------|
| 2000 | Advantage California Municipal Income Trust | 156,125 |
| 2000 | Advantage Municipal Income Trust | 3,098,827 |
| 2000 | Advantage Municipal Income Trust II | 1,209,161 |
| 2000 | Advantage Pennsylvania Municipal Income Trust | 714,968 |
| 2000 | Bond Fund | 527,688 |
| 2000 | California Quality Municipal Income Trust | 1,606,644 |
| 2000 | California Value Municipal Income Trust | 986,903 |
| 2000 | ComStock Fund | 11,018,573 |
| 2000 | Corporate Bond Fund | 1,119,604 |
| 2000 | Emerging Growth Fund | 62,973,355 |

| | | |
|---|---|---|
| 2000 | Enterprise Fund | 16,803,454 |
| 2000 | Equity Trust | 2,078,165 |
| 2000 | Equity Trust II | 12,986,971 |
| 2000 | Equity and Income Fund | 9,612,086 |
| 2000 | Exchange Fund | 533,732 |
| 2000 | Florida Municipal Opportunity Trust | 249,102 |
| 2000 | Florida Quality Municipal Trust | 1,062,694 |
| 2000 | Government Securities Fund | 8,422,360 |
| 2000 | Growth and Income Fund | 6,346,074 |
| 2000 | Harbor Fund | 3,653,485 |
| 2000 | High Income Trust | 895,445 |
| 2000 | High Income Trust II | 684,421 |
| 2000 | High Income Corporate Bond Fund | 4,421,601 |
| 2000 | Income Trust | 707,318 |
| 2000 | Investment Grade Municipal Trust | 418,960 |
| 2000 | Life Investment Trust | 39,307 |
| 2000 | Ltd Duration Fund | 170,232 |
| 2000 | MassachusettsValue Municipal Income Trust | 411,990 |
| 2000 | Municipal Income Trust | 1,300,189 |
| 2000 | Municipal Opportunity Trust | 2,551,229 |
| 2000 | Municipal Opportunity Trust | 1,772,272 |
| 2000 | Municipal Trust | 5,800,864 |
| 2000 | New York Value Municipal Income Trust | 663,051 |
| 2000 | New Jersey Value Municipal Income Trust | 390,999 |
| 2000 | New York Quality Municipal Trust | 941,307 |
| 2000 | Ohio Quality Municipal Trust | 722,588 |
| 2000 | Ohio Value Municipal Value Trust | 249,719 |
| 2000 | Pace Fund | 7,655,193 |
| 2000 | Pennsylvania Quality Municipal Trust | 1,371,548 |
| 2000 | Pennsylvania Tax Free Income Fund | 1,436,605 |
| 2000 | Pennsylvania Value Municipal Income Trust | 712,303 |
| 2000 | Real Estate Securities Fund | 1,458,807 |
| 2000 | Reserve Fund | 1,443,671 |
| 2000 | Select Sector Municipal Trust | 640,854 |
| 2000 | Senior Floating Rate Fund | 15,073,901 |
| 2000 | Senior Income Trust | 21,164,948 |

| 2000 | Senior Loan Fund | 69,830,499 |
|---|---|---|
| 2000 | Strategic Sector Municipal Trust | 1,548,836 |
| 2000 | Tax Exempt Trust | 7,761,455 |
| 2000 | Tax Free Money Fund | 176,265 |
| 2000 | Tax Free Trust | 5,894,012 |
| 2000 | Trust for Investment Grade Municipals | 4,479,573 |
| 2000 | Trust for Investment Grade Florida Municipals | 693,007 |
| 2000 | Trust for Investment Grade New Jersey Municipals | 673,158 |
| 2000 | Trust for Investment Grade California Municipal | 754,811 |
| 2000 | Trust for Investment Grade Pennsylvania Municipals | 1,245,027 |
| 2000 | Trust | 1,316,610 |
| 2000 | Trust for Insured Municipals | 1,443,578 |
| 2000 | Trust for Investment Grade New York Municipals | 1,047,635 |
| 2000 | U.S. Government Trust | 9,238,145 |
| 2000 | U.S. Government Trust for Income | 608,128 |
| 2000 | Value Municipal Income Trust | 3,590,159 |
| | **Total** | **328,560,191** |

| 2001 | Advantage California Municipal Income Trust | 313,403 |
|---|---|---|
| 2001 | Advantage Municipal Income Trust | 3,130,849 |
| 2001 | Advantage Municipal Income Trust II | 1,228,974 |
| 2001 | Advantage Pennsylvania Municipal Income Trust | 710,469 |
| 2001 | Bond Fund | 1,067,886 |
| 2001 | California Quality Municipal Income Trust | 1,566,126 |
| 2001 | California Value Municipal Income Trust | 995,837 |
| 2001 | ComStock Fund | 18,120,356 |
| 2001 | Corporate Bond Fund | 1,281,946 |
| 2001 | Emerging Growth Fund | 64,711,576 |
| 2001 | Enterprise Fund | 16,803,454 |
| 2001 | Equity Trust | 906,571 |
| 2001 | Equity Trust II | 11,645,820 |
| 2001 | Equity and Income Fund | 4,382,283 |
| 2001 | Exchange Fund | 434,637 |
| 2001 | Florida Municipal Opportunity Trust | |
| 2001 | Florida Quality Municipal Trust | 1,035,588 |
| 2001 | Government Securities Fund | 7,786,183 |

| | | |
|---|---|---|
| 2001 | Growth and Income Fund | 8,492,364 |
| 2001 | Harbor Fund | 3,246,811 |
| 2001 | High Income Trust | 745,638 |
| 2001 | High Income Trust II | 563,116 |
| 2001 | High Income Corporate Bond Fund | 3,871,821 |
| 2001 | Income Trust | 673,619 |
| 2001 | Investment Grade Municipal Trust | 432,982 |
| 2001 | Life Investment Trust | 617,834 |
| 2001 | Ltd Duration Fund | 320,965 |
| 2001 | Massachusetts Value Municipal Income Trust | 414,729 |
| 2001 | Municipal Income Trust | 2,614,436 |
| 2001 | Municipal Opportunity Trust | 2,582,252 |
| 2001 | Municipal Opportunity Trust II | 1,772,272 |
| 2001 | Municipal Trust | 5,653,900 |
| 2001 | New York Value Municipal Income Trust | 673,984 |
| 2001 | New Jersey Value Municipal Income Trust | |
| 2001 | New York Quality Municipal Trust | 941,307 |
| 2001 | Ohio Quality Municipal Trust | 690,223 |
| 2001 | Ohio Value Municipal Value Trust | 246,638 |
| 2001 | Pace Fund | 13,783,295 |
| 2001 | Pennsylvania Quality Municipal Trust | 1,307,195 |
| 2001 | Pennsylvania Tax Free Income Fund | 1,384,173 |
| 2001 | Pennsylvania Value Municipal Income Trust | 718,261 |
| 2001 | Real Estate Securities Fund | 2,433,747 |
| 2001 | Reserve Fund | 3,088,560 |
| 2001 | Select Sector Municipal Trust | 633,541 |
| 2001 | Senior Floating Rate Fund | 2,468,882 |
| 2001 | Senior Income Trust | 18,555,986 |
| 2001 | Senior Loan Fund | 49,501,572 |
| 2001 | Strategic Sector Municipal Trust | 1,623,122 |
| 2001 | Tax Exempt Trust | 8,853,721 |
| 2001 | Tax Free Money Fund | 157,810 |
| 2001 | Tax Free Trust | 5,919,482 |
| 2001 | Trust for Investment Grade Municipals | 4,539,189 |
| 2001 | Trust for Investment Grade Florida Municipals | 806,590 |
| 2001 | Trust for Investment Grade New Jersey Municipals | 850,059 |

| 2001 | Trust for Investment Grade California Muni | 759,073 |
|------|-------------------------------------------|---------|
| 2001 | Trust for Investment Grade Pennsylvania Municipals | 1,230,042 |
| 2001 | Trust | 1,108,721 |
| 2001 | Trust for Insured Municipals | 1,441,887 |
| 2001 | Trust for Investment Grade New York Municipals | 1,044,367 |
| 2001 | U.S. Government Trust | 8,929,284 |
| 2001 | U.S. Government Trust for Income | 619,180 |
| 2001 | Value Municipal Income Trust | 3,645,255 |
|      |                                           |         |
|      | **Total** | **306,079,843** |
|      |                                           |         |
|      | **Cumulative Total for 2000-2001** | **634,640,034** |

265.    The other Van Kampen defendants, which are all affiliates of the Adviser Defendants, also receive hundreds of millions of dollars in fees each year from the Funds. For example, in the year 2003, the Distributor received nearly $39 million in fees from the Equity and Income Fund alone. The Transfer Agent received approximately $12 million from that Fund alone in 2003.

266.    Both the Investment Advisory and Distribution fees are based on a percentage of assets under management. So by permitting and/or ignoring the market timing and late trading described above, the Van Kampen defendants directly increased assets under management and their fees.

(7)     **Standing**

267.    Each of the Van Kampen Funds is a series of one of the Trusts. However, for all practical purposes the Van Kampen Funds are operated as a single entity. Each of the funds is created and sponsored by the VKAM or its affiliates and is managed under the supervision of the Trustees. The meetings of the Boards for all the Funds occur at or about the same time. VKAM is the adviser for all of the Funds, and appoints the same

distributor, the same custodian, and the same transfer agent for all the funds, all of whom serve indefinite terms. The agreements between the funds and each of these entities are substantially identical form agreements, with only minor differences only in fee percentages. In many instances, the funds share costs among themselves. In substance, all the funds are operated as a single de facto entity. The Van Kampen Funds are marketed as, and for all other intents and purposes are treated as, one entity. Plaintiff therefore brings this action as a derivative action on behalf of the entire family of Van Kampen Funds, as well as on behalf of the particular Funds in which he invested.

### (8)   **Breach of Contract Allegations**

268.   The contract between the Van Kampen Equity Income Fund and the Distributor is typical of the distribution contracts entered into on behalf of the Funds. The contract is entered into for the benefit of the Fund with the relevant Investment Company and the Distributor as the parties. *See* Distribution and Service Agreement between Van Kampen Equity Trust and the Distributor, dated February 4, 1999.[12] §5.3. Pursuant to the agreement, the Trust appoints the Distributor as the principal underwriter and "exclusive distributor of each class of its shares of beneficial interest (the "Shares")," *Id.* §1, and requires that in selling Fund Shares, the Distributor shall "duly comply with all state and federal laws relating to the sale of such securities and with all applicable rules and regulations of all regulatory bodies, including . . . the National Association of Securities Dealers, Inc. and all applicable rules and regulations of the Securities and Exchange Commission under the 1940 Act . . ." *Id.* §4.

---

[12]   Each of the contracts described in this Complaint can be found through the SEC EDGAR website at: http://www.sec.gov/edgar/searchedgar/companysearch.html.

269.   The Investment Advisory contract between the Van Kampen Equity Trust on behalf of the Select Growth Fund and VKAM is typical of the Investment Advisory contracts entered into on behalf of the Funds.  It provides that the adviser agrees to render services and portfolio management "in accordance with the policies adopted by the Fund and its Board of Trustees." *See* Investment Advisory Agreement between Van Kampen Equity Trust and Van Kampen Investment Advisory Corp. dated January 28, 2000 §1(b).

270.   By engaging in the acts and scheme described in this complaint, the Adviser Defendants and the Distributor breached these contracts, as is alleged below.

271.   Paragraphs 272 through 500 intentionally left blank.

V.     **DEMAND EXCUSED ALLEGATIONS**

501.   The allegations concerning demand futility do not apply to claims asserted by the plaintiff under Section 36(b) of the ICA, which does not confer a direct right upon the Funds to bring such claims.

502.   The Plaintiff has not made demand upon the Trustees of the Van Kampen Funds to bring an action against the Van Kampen Defendants, Morgan Stanley Defendants or the Additional Defendants or other culpable parties to remedy such wrongdoing because doing so is excused or would be futile for the reasons set forth below.

(a)     Demand is excused because no such demand is required for the Plaintiff to assert a federal claim under Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b), for breach of fiduciary duty in connection with the compensation and other payments paid to the funds' adviser and affiliates.

(b)     The Trustees are put into office by the Van Kampen Defendants, and are not required to stand for election or reelection by shareholders of the Funds

except on rare occasions, and thus are not accountable to the shareholders of the Funds. Shareholders have not been permitted to elect Trustees since at least 1999. Nor can shareholders effectively remove Trustees. Rather, the Trustees effectively serve at the pleasure of the Van Kampen Defendants. Additionally, the Trustees serve on the boards of all the Trusts of the Van Kampen Funds, and are paid for this service with substantial fees and lucrative retirement benefits, in magnitudes that are sufficient to influence them to act in the interest of the Van Kampen Defendants when the interests of the Van Kampen Defendants may conflict with the interests of the Funds. Moreover, the Trustees appoint the officers of the funds and have appointed solely officers and employees of the Van Kampen and Morgan Stanley Defendants to fill these roles. This further illustrates that the Trustees act in the interest of the Van Kampen Defendants.

(c)     The Trustees have been well aware, for a very long period of time, of the existence of the types of activity complained of in this action, and of the potential that such activity might have been taking place in the Funds, yet have failed to investigate or to do anything to recover for damages caused to the Funds by such activities. Indeed, despite the Trustees' awareness of investigations by state and federal law enforcement authorities, and of the legal actions that have been brought by such authorities, the Trustees have failed to take any action to investigate and have failed to take any action to recover for the Funds the damages cause to them by such unlawful activity.

(d)     Market timing is a phenomenon that has been common knowledge in the mutual fund industry At least since the 1970s. As early as 1989, the high-profile mutual fund company Fidelity Investments began to impose and enforce heavy redemption fees on short term trades in its mutual fund shares. In 1992, a widely-publicized book entitled *The New Market Wizards*, focused attention on market timing.

(e)     Since at least as early as November 5, 1997, when an article appeared in THE WALL STREET JOURNAL entitled "*Mutual Funds Fight the 'Market Timers*,*" the unlawful practices complained of have been well-known to persons in the mutual fund industry, including the Trustees of the Funds.   That article detailed the prevalence of market timing in major mutual funds, the types of harm that such activity visited upon the mutual funds, and the types of measures that some mutual funds had taken and were taking in order to discourage or prevent such market timing altogether.

(f)     As stated in an article printed in FORTUNE on April 19, 2004, "Clearly, by 2001 everyone connected with the fund industry had to know how crooked the business had become." *See The Secrets of Eddie Stern*, FORTUNE (April 14, 2004). The article also noted that after the current mutual fund scandal broke, the SEC surveyed 88 of the largest fund companies and discovered that half admitted to allowing market timing, and 25 percent allowed late trading.

(g)     Even though the Trustees have had knowledge of the existence and extensiveness of unlawful market timing taking place in the industry, and of the harm that results to mutual funds and fund shareholders, the Trustees either have failed to take action, despite their knowledge, with respect to such practices in connection with the Funds or they have failed to put in place the proper supervision and control mechanisms that would have brought the existence of such unlawful practices in the Funds to their attention.

(h)     Under Section 15(c) of the ICA, 15 U.S.C. § 15(c), the Trustees have and had an express duty "to request and evaluate … such information as may reasonably be necessary to evaluate the terms" of any investment advisory contract with respect to the Fund.   In this case, Trustees have and had a duty to obtain all information

regarding all arrangements of the Adviser Defendants *and their related Affiliates*. Any terms, conditions, or arrangements whereby the Van Kampen Defendants facilitated, encouraged, permitted, and participated in, or failed to detect and prevent, the illegal acts alleged herein were, in fact, part of the Adviser Defendants' contracts.

(i)     Alternatively, any such arrangements are and were, at minimum, among the information "reasonably necessary to evaluate the terms of" the Investment Advisory Agreement or Contract, within the meaning of Section 15(c) of the Investment Company Act. Consequently, the Trustees either failed to request all of the "reasonably necessary" information they needed to evaluate the Investment Advisory Contract or the contracts of its Affiliates.

(j)     Indeed, given the Trustees' knowledge of the prevalence and commonplace nature of late trading and market timing in the mutual fund industry, it was incumbent upon the Trustees to take the obvious, prudent measure of implementing some kind of audit system or program that would enable them to discover all aspects and all components of the advisory contract with respect to the Funds. Had the Trustees done this, they would have become aware of the existence of the specific late trading and market timing arrangements in place with respect to such funds. However, the Trustees failed to put any such necessary system or program in place, thus subjecting themselves to a substantial risk of personal liability for breach of their fiduciary duty because of their gross negligence, and rendering themselves incapable of being able to impartially consider a shareholder demand, thereby compromising their independence.

(k)     The Trustees' duties required them independently to act without a demand from a shareholder under the circumstance of this action. Their duties did not and do not come into play only when "kick-started" by a shareholder demand. The

Trustee Defendants' fiduciary duties apply and applied at all times to require them to act in the best interest of the Funds, to protect the Funds from harm, and to recover damages for the Funds when the Funds have been harmed.

(l)     On September 3, 2003, the NYAG commenced the NYAG Complaint, thus bringing the market timing and late trading scandal to the attention of the world.  Before and after the commencement of the NYAG Complaint, state and federal regulators notified mutual funds of an investigation into market timing and late trading. Since the NYAG Complaint was filed, state and federal regulators have entered into consent enforcement actions with at least six different mutual fund families, representing recoveries of civil penalties and recoveries in excess of $2 billion. The regulators' investigation, the filing of the NYAG Complaint, and the subsequent enforcement actions have highlighted the existence of market timing and late trading as well as the magnitude and severity of the scandal throughout the mutual fund industry.  No Trustee could claim to be ignorant of the market timing and late trading scandal since September 3, 2003. Despite that, however, the Trustees have failed to take any action against many persons responsible for causing harm to the Funds by market timing or late trading.

(m)    The purpose of a demand requirement is to bring matters to the attention of the Trustees so that they can determine what action, if any, to take regarding the matter about which the demand is made.  Here, the Trustees *already are aware* of the matters about which they should take action to recover damages for harm to the Funds caused by market timing and late trading.  Since the Trustees are already aware of the matters requiring their action, and of their duty to act, any demand under these circumstances would be nothing but redundant surplusage and would serve as nothing but an unnecessary formality that would elevate form over substance.

(n)     Because the Trustees have failed for a lengthy time period to take proper action to recover for the Funds all of the damages they have suffered because of market timing and late trading, doing so at this point would be tantamount, from their perspective, to an admission that earlier action on their part was inadequate, thereby subjecting themselves to a substantial likelihood of personal liability for breach of their duty of care.

(o)     Given the Trustees' awareness of the foregoing facts, and their demonstrated failure to act in the face of their knowledge of those facts, there is, at minimum, a reasonable doubt as to whether they would be independent and disinterested in responding to a demand.  Moreover, given the egregiousness of the Trustees' failure of oversight as outlined above, there is, at minimum, a substantial likelihood that they will be subject to personal liability for inadequate oversight of the officers and employees of the Funds. This exposure to a substantial likelihood of personal liability prevents the Trustees from being able to consider a demand impartially, if one had been made.

(p)     The likelihood of personal liability is even more pronounced in the case of those Trustees who served on the Audit Committee and Governance Committee of the Funds, since those members had easy access to the internal documents that revealed the market timing and late trading that harmed the Funds yet they took no steps to prevent such activity or to recover damages that the Funds suffered on account of such activity.

503.    Demand is also excused because the unlawful acts and practices alleged in this Complaint are not subject to the protection of any business judgment rule and could not be ratified, approved, or condoned by disinterested and informed Trustees under any circumstances.

504.   Paragraphs 504 through 600 intentionally left blank.

## COUNT I

## VIOLATIONS OF SECTIONS 36(b) OF THE  INVESTMENT COMPANY ACT
### (Against the Adviser Defendants, Transfer Agent and Distributor)

601.   Plaintiff incorporates by reference all paragraphs above except paragraphs relating to demand.  No demand is required under Section 36(b) of the ICA.

602.   The Funds and each of them are registered investment companies under the ICA.

603.   The Adviser Defendants are investment advisers to the Funds under Section 2 of the ICA.

604.   The Distributor and Transfer Agent are "affiliates" of the Adviser Defendants and each of them as that term is defined in Section 2(a)(3) of the ICA.

605.   Pursuant to Section 36(b) of the ICA, 15 U.S.C. § 80a-35(b), the investment adviser of a mutual fund owes to the investment company a fiduciary duty with respect to the receipt of compensation for services or payments of a material nature paid by the mutual fund to such investment adviser or any affiliated person. Those fiduciary duties apply not only to the terms of the advisory fee agreements, but also to the manner in which advisers seek approval of such agreements.

606.   Pursuant to Section 36(b) of the ICA, 15 U.S.C. §80a-35(b), the Adviser Defendants owe and owed to the Funds the fiduciary duties of loyalty, candor, and due care with respect to their receipt of compensation for services or payments of any material nature paid by the Funds or its shareholders to the Adviser Defendants or any affiliated person.  Those fiduciary duties include, but are not limited to, the duty of the Adviser Defendants to seek approval of any advisory agreement upon full disclosure of

71

all information material to the Trustees' decision regarding the Adviser Defendants' compensation.

607.   Pursuant to Section 15(c) of the ICA, 15 U.S.C. § 80a-15(c), the investment adviser of a mutual fund owes to the investment company the duty to furnish the directors of the fund "such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of such [mutual fund] company."

608.   Thus, among other things, Section 36(b) of the ICA prohibits and prohibited the Adviser Defendants from soliciting the approval of any advisory agreement from the Funds or the Trustees by use of false or misleading information, or by failing to disclose information material to the Trustees' decision regarding the Adviser Defendants' compensation.  Information concerning conflicts of interest, the nature and extent of the conflicts, the nature and the Adviser Defendants' permission, facilitation, or encouragement of and participation in, or failure to detect the deceptive and manipulative schemes such as those described in the Complaint are particularly important to the Funds and to their Trustees.

609.   After a reasonable opportunity to conduct discovery, Plaintiff believes the evidence will show that, for any of the Funds, the Adviser Defendants and their affiliates did not make full and fair disclosure of all information that would be material to the Trustees' decision regarding fees and/or other compensation under advisory and/or other agreements, including in particular the Adviser Defendants', Transfer Agent's, and Distributor's permission, facilitation, or encouragement of and participation in, or failure to detect and prevent, the market timing and late trading described in this Complaint.

610.    Pursuant to Section 15(c) of the ICA, 15 U.S.C. § 80a-15(c), the Trustees of a mutual fund owe to the mutual fund an independent duty to "request and evaluate . . . such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of such [mutual fund] company."

611.    After a reasonable opportunity to conduct discovery, plaintiffs believe the evidence will show that, for any of the Funds, the Trustees did not request and/or evaluate information as reasonably may be necessary to evaluate advisory and/or other agreements, including in particular the Adviser Defendants' facilitation, permission, or encouragement of and participation in, or failure to detect and prevent, market timing and late trading.

612.    Pursuant to Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b), mutual fund shareholders may bring a civil action against an investment adviser *or any affiliated person* who has breached his or its fiduciary duty concerning such compensation or other payments.

613.    Each of the Adviser Defendants, the Transfer Agent and the Distributor breached his, her, or its fiduciary duty to the Funds by the acts alleged in this Complaint including, without limitation, facilitating, permitting, or encouraging, participating in, or failing to detect and prevent, the acts alleged in this Complaint which were designed to increase deposits on the short term on which they would and did receive fees and other compensation which fees bore no reasonable relationship to services or benefits rendered to the Funds.

614.    By agreeing and/or conspiring with each other to facilitate, permit, or encourage, participate in, or by failing to detect and prevent, the illegal acts alleged in

this Complaint, the Adviser Defendants, the Transfer Agent and the Distributor placed their own self-interest in maximizing their compensation and other payments over the interests of the Funds.

615.   As alleged herein, the Adviser Defendants, the Transfer Agent, and the Distributor breached their fiduciary duties with respect to the receipt of compensation for services or other payments of a material nature from the Funds or their shareholders.

616.   By virtue of the foregoing, the Adviser Defendants, the Transfer Agent and the Distributor have violated Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b).

617.   As a direct and proximate result of the wrongdoing of the Adviser Defendants, the Transfer Agent and the Distributor as alleged in this Complaint, the Van Kampen Funds have been reduced and diminished in value and the net value (NAV) of the Van Kampen Funds has been wasted.

## COUNT II

### VIOLATION OF SECTION 36(a) OF THE INVESTMENT COMPANY ACT
### (Against The Adviser Defendants, Distributor, and Trustees)

618.   Plaintiff incorporates by reference all paragraphs above.

619.   The Trusts are registered investment companies.

620.   The Adviser Defendants are investment advisers under Section 36(a) as that term is defined in Section 2 of the ICA.

621.   The Distributor acts as the principal underwriter for the Funds under Section 36(a) as defined in Section 2 of the ICA.

622.   The Trustees are directors under Section 36(a) as that term is defined in Section 2 of the ICA.

623.    VKAM and Morgan Stanley, by virtue of their ownership and position, are liable for the actions of those entities.

624.    Pursuant to Section 36(a) of the ICA, 15 U.S.C. §80a-35(a), the Adviser Defendants, the Distributor, and the Trustees owe and owed to the Funds the fiduciary duties of loyalty, candor, and due care, including the duty of the advisers to seek approval of any advisory agreement with full disclosure of information material to the board's decision regarding their compensation and the duty of the Trustees to request and evaluate such information as may reasonably be necessary to evaluate advisory agreements.

625.    Pursuant to Section 15(c) of the ICA, 15 U.S.C. § 80a-15(c), the investment adviser of a mutual fund owes to the mutual fund the duty to furnish the directors of the fund "such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of such [mutual fund] company."

626.    After a reasonable opportunity to conduct discovery, plaintiff believes the evidence will show that the Adviser Defendants and the Distributor did not make full and fair disclosure of all information that would be material to a board's decision regarding advisory and/or other compensation under advisory and/or other agreements, including in particular their facilitation, permission, or encouragement of and participation in, or failure to detect and prevent, market timing and late trading in any of the Funds.

627.    Pursuant to Section 15(c) of the ICA, 15 U.S.C. § 80a-15(c), the directors of a mutual fund owe to the mutual fund an independent duty to "request and evaluate . . . such information as may reasonably be necessary to evaluate the terms of any contract

whereby a person undertakes regularly to serve or act as investment adviser of such [mutual fund] company."

628.   After a reasonable opportunity to conduct discovery, plaintiff believes the evidence will show that the Trustees did not request and/or evaluate information as reasonably may be necessary to evaluate advisory and/or other agreements, including in particular the Adviser Defendants, Transfer Agents and Distributor's facilitation, permission, or encouragement of and participation in, or failure to detect and prevent, market timing and late trading in any of the Funds.

629.   Pursuant to Section 47(b) of the ICA, 15 U.S.C. § 46(b), an investment advisory agreement that is made in, or whose performance involves a, violation of the ICA, is null and void, and "is unenforceable by either party." Pursuant to Section 47(b) of the ICA, 15 U.S.C. § 46(b), any advisory agreement made in, or whose performance involves a, violation of the ICA, may be rescinded by the mutual fund.

630.   Each of the Adviser Defendants, the Distributor, and the Trustees breached his, her, or its fiduciary duty to the Funds by the other acts alleged in this Complaint including, without limitation, allowing market timing and late trading all in exchange for their own benefit.

631.   By agreeing and/or conspiring to permit and/or encourage the market timing in the Funds, the Adviser Defendants, the Distributor, and the Trustees placed their own self-interest in maximizing their compensation and other payments over the interests of the Funds.

632.   As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, the adoption and approval of the advisory agreements and the 12b-1 Plans, Dead Weight, Dilution, and Concentration, all of which

reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

## COUNT III

### VIOLATIONS OF SECTION 47 OF THE INVESTMENT COMPANY ACT
### (Against the Adviser Defendants and the Distributor)

633.    Plaintiff incorporates by reference all paragraphs above.

634.    Pursuant to Section 47(b) of the ICA, 15 U.S.C. § 80a-46(b), any contract made in violation of, or the performance of which results in a violation, of the ICA is declared unenforceable.

635.    For the reasons alleged herein, the agreements between the Adviser Defendants and the Funds, and the Distributor and the Funds, including the 12b-1 Plans, were made in violation of, and their performance resulted in violations of, the ICA and are, therefore, unenforceable.

636.    Under Section 47(b) of the ICA, 15 U.S.C. § 80a-46(b), these agreements and the 12b-1 Plans may be voided and the Adviser Defendants and the Distributor are liable to return to the Funds all of the fees and consideration of any kind paid to them thereunder.

## COUNT IV

### VIOLATION OF SECTIONS 206 AND 215 OF THE
### INVESTMENT ADVISERS ACT OF 1940
### (Against Adviser Defendants and Distributor)

637.    Plaintiff incorporates by reference all paragraphs above.

638.    The Adviser Defendants are investment advisers within the meaning of the IAA.

639.    The Funds are clients of the Adviser Defendants within the meaning of Section 206 of the IAA.

640.    Section 206 of the IAA, 15 U.S.C. § 80b-6, prohibits investment advisers from, among other things, directly or indirectly using the mails or any means or instrumentality of interstate commerce to (a) employ any device, scheme, or artifice to defraud a client or prospective client; (b) engage in any transaction, practice, or course of business which operates as a fraud or deceit upon a client; and (c) engage in any act, practice, or course of conduct which is fraudulent, deceptive, or manipulative.

641.    The Adviser Defendants have violated Section 206 of the IAA by acting as alleged herein.    In particular, after a reasonable opportunity to conduct discovery, Plaintiff believes the evidence will show that the Adviser Defendants facilitated, encouraged, permitted, and participated in, or failed to detect and prevent, the participation in the manipulative schemes alleged in this Complaint, entered into their own personal gain at the expense of the Funds, and did not make full and fair disclosure of all information that would be material to a Trustee's decision regarding advisory and/or other compensation under advisory and/or other agreements.

642.    Pursuant to Section 215 of the IAA, 15 U.S.C. § 80b-15, any investment advisory agreement made or approved in violation of any provision of the IAA, including the investment advisory agreements between the Adviser Defendants or the Distributor Defendants and the Funds or the Trustees and the 12b-1 Plans, is null and void and may not be enforced by any party thereto.

643.    As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, the adoption and approval of the advisory agreements and the 12b-1 Plans, which reduced the assets and value (including the NAV) of the Funds, for which Defendants are liable.

**COUNT V**

**CONTROL PERSON LIABILITY UNDER SECTION 48 OF
THE INVESTMENT COMPANY ACT
(Against Morgan Stanley, Van Kampen Investments, Inc.
And The Trustees)**

644.     Plaintiff incorporates by reference all paragraphs above.

645.     Section 48 of the ICA, 15 U.S.C. § 47(a), provides that it is unlawful for any person, directly or indirectly, to cause another person to do any act or thing that violates the ICA.

646.     The Control Person Defendants[13] directly or indirectly, caused the Adviser Defendants, the Transfer Agent, and the Distributor to engage in the unlawful conduct alleged in this Complaint.

647.     Pursuant to Section 48 of the ICA, 15 U.S.C. § 47(a), the Control Person Defendants are liable for causing, directly or indirectly, the Adviser Defendants, the Transfer Agent, and the Distributor to engage in the unlawful conduct alleged herein.

648.     As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, the adoption and approval of the advisory agreements and the 12b-1 Plans, all of which reduced the assets and value (including the NAV) of the Funds, for which send defendants are liable.

**COUNT VI**

**COMMON LAW BREACH OF FIDUCIARY DUTY
(Against the Fiduciary Defendants)**

649.     Plaintiff incorporates by reference all of the paragraphs above.

---

[13]     The Control Person Defendants are defined as Morgan Stanley, Van Kampen Investments, Inc. and the Trustees.

650.    The Fiduciary Defendants[14], and each of them, owe and owed to the Funds and the Funds the fiduciary duties of loyalty, candor, and due care in the management and administration of the affairs of each of the Funds and in the use and preservation of the Funds' property and assets.  Further, the Fiduciary Defendants owed a duty to each of the Funds not to waste the Funds' assets and not to place their own personal self-interest above the best interest of the Funds.

651.    To discharge those duties, the Fiduciary Defendants and each of them were required to exercise prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of the Funds.

652.    As alleged in this Complaint, each of the Fiduciary Defendants breached his, her, or its fiduciary duties by approving or receiving unlawful or excessive compensation or payments in connection with the market timing and late trading and other manipulative arrangements and devices as alleged in this Complaint.

653.    As alleged above, each of the Fiduciary Defendants also breached his, her, or its fiduciary duties to preserve and not to waste the assets of the Funds and each of them by permitting or incurring excess charges and expenses to the Funds in connection with the illegal activity described in this Complaint.

654.    As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, the adoption and approval of the advisory agreements and the 12b-1 Plans, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.  Each of the Fiduciary Defendants is

---

[14]  The Fiduciary Defendants include the Van Kampen Defendants, the Adviser Defendants, and the Trustee Defendants.

jointly and severally liable to the Funds and the shareholders for the losses, damages and harms proximately caused by these breaches of fiduciary duty.

## COUNT VII

### BREACH OF CONTRACT
### (Against the Adviser Defendants and the Distributor)

655.    Plaintiff incorporates by reference all paragraphs above.

656.    The Funds and the Adviser Defendants and each of them entered into Investment Advisory Agreements which are renewed annually.

657.    The Funds and the Distributor entered into a Distribution Agreement and 12b-1 Plan which are renewed annually.

658.    The Funds have fully performed their obligations under the Investment Advisory Agreement and the Distribution Agreement.

659.    The Investment Advisory Agreements required and require the Adviser Defendants to adhere to the Funds' policies and prospectuses and to the Rules and Regulations of the NASD and the SEC..

660.    The Adviser Defendants breached the Investment Advisory Agreements by the wrongful acts alleged in this Complaint:

(a)    The Adviser Defendants breached the implied covenant of good faith and fair dealing of the Investment Advisory Agreements with the Funds and each of them.

(b)    The Adviser Defendants breached their obligation under the Investment Advisory Agreements with the Funds and each of them to manage the funds

and carry out their duties in accordance with the policies adopted by the Funds and the Trustees.

661.    The Distributor breached the Distribution and Service Agreement by the wrongful acts alleged in this Complaint:

(a)    The Distributor breached the Distribution and Service Agreement with the Funds and each of them by failing to comply with the policies adopted by the Funds and the Trustees.

(b)    The Distributor breached the Distribution and Service Agreement with the Funds and each of them by breaching the implied covenant of good faith and fair dealing.

662.    As a direct and proximate result of the wrongful conduct described in this Complaint, the assets and value (including the NAV) of the Funds has been reduced and diminished and the corporate assets of the Funds and the Funds have been wasted.

663.    Paragraphs 664-665 intentionally left blank.

## COUNT VIII

### BREACH OF CONTRACT
### (Against BAS)

666.    Plaintiff incorporates by reference all paragraphs above.

667.    Upon information and belief, throughout the relevant period, BAS and the Van Kampen Defendants were parties to written or oral sales agreements governing BAS's duties as broker-dealer in selling and processing trades of Fund shares (the "Dealer Agreements").

668.    The Funds for whose benefit the Adviser Defendants entered into the Dealer Agreements, are intended third-party beneficiaries of the Dealer Agreements.

669.   There is implied in all agreements an obligation of good faith and fair dealing pursuant to which neither party make take any action that will deliberately frustrate the other party's purpose in entering into the contract.

670.   Upon information and belief, under the Dealer Agreements, information and belief, in the Dealer Agreements, BAS expressly agreed to clear mutual fund orders through the NSCC's Fund SERV system and to transmit orders that are received prior to 4 p.m. by a certain time that day ("Day 1"), and those received after 4 p.m. by a certain time the next business day ("Day 2"). Under the Dealer Agreements, BAS and the Van Kampen Defendants agreed that Day 1 Trades would be priced at the Day 1 NAV and the Day 2 Trades would be priced at the Day 2 NAV.

671.   BAS had an express or implied obligation to comply with the federal securities laws, the ICA, the IAA, and all rules and regulations promulgated by the SEC, including the forward pricing rule.

672.   In breach of the express or implied terms of the Sales Agreements, and in violation of its obligation of good faith and fair dealing, defendant BAS permitted brokers and timers, including defendants Aurum, Trautman, Canary, and Pritchard, to submit orders for the purchase and sale of shares of mutual funds, on BAS's RJE electronic trading platform or otherwise, after 4 p.m. on a given day (Day 2 Trade) at that day's NAV (Day 1 NAV), in violation of the forward pricing rule, and permitted the Funds identified in paragraph 272 hereto to be late traded and timed to the detriment of the funds.

673.   Accordingly, BAS has breached its Dealer Agreements with the Van Kampen Defendants.

674.   As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

## COUNT IX

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against the Additional Defendants)

675.   Plaintiff incorporates by reference all paragraphs above.

676.   The Additional Defendants and each of them knew of the existence of the fiduciary duty between the Fiduciary Defendants, the Trustees and each of them on the one hand and the Funds on the other hand and knew the extent of that duty.   The Additional Defendants knew of the acts described in this Complaint and knew that these acts were a breach of the fiduciary duties the Fiduciary Defendants owed to the Funds.

677.   The Additional Defendants and each of them allowed for the use of their instrumentalities for the unlawful purposes described in this Complaint.

678.   The Additional Defendants maliciously, without justification and through unlawful means aided and abetted the Fiduciary Defendants in breaching their fiduciary duties and provided substantial assistance and encouragement to the Fiduciary Defendants in violating their fiduciary duties in the manner and by the actions described in this Complaint.

679.   The Additional Defendants are jointly and severally liable with the Fiduciary Defendants to the Funds for damages proximately caused by their aiding and abetting as alleged herein.

680.   As a direct and proximate result of their unlawful conduct, the Plaintiff has suffered damages for which the Additional Defendants are liable.

## COUNT X

### UNJUST ENRICHMENT
### (Against All Defendants)

681.    Plaintiff incorporates by reference all paragraphs above.

682.    All Defendants received a benefit in the profits they earned as a result of the unlawful conduct as described in this Complaint from trading on the Funds at the expense of the Funds.

683.    Justice and equity require that the Defendants not be allowed to retain those profits.

684.    Justice and equity require that the Defendants' unlawfully earned profits be disgorged and returned to Funds because such profits belong to the Funds.

## COUNT XI

### COMMON LAW INTERFERENCE WITH CONTRACT
### (Against the Additional Defendants )

685.    Plaintiff incorporates by reference all paragraphs above.

686.    The Funds and the Adviser Defendants and the Funds and the Distributor are parties to contracts identified in this Complaint.

687.    The Adviser Defendants and the Distributor breached those contracts in the manner and by the actions described in this Complaint.

688.    The Additional Defendants knew of the existence of the contracts described in this Count and knew their terms.

689.    The Additional Defendants knowingly and intentionally induced the Adviser Defendants and the Distributor to breach these contracts and interfered with the Adviser Defendants and Distributor present and future performance of the contracts by

the acts of wrongdoing described in this Complaint, intending to and proximately causing the described breaches of contract.

690.   The Additional Defendants carried out this wrongful conduct with the knowledge that their conduct would cause breaches of the contracts and did cause breaches of the contract.

691.   The Additional Defendants acted without justification or privilege.

692.   As a direct and proximate result of the Additional Defendants' illegal conduct they are jointly and severally liable to the Funds with the Adviser Defendants and the Distributor for the injuries and damages suffered and which they will continue to suffer.

## COUNT XII

## CIVIL CONSPIRACY
## (Against All Defendants)

693.   Plaintiff incorporates by reference all paragraphs above.

694.   The Defendants and various combinations of them entered into an agreement or agreements or combinations between and among each other to accomplish by common plan the illegal acts described in this Complaint and by their actions demonstrated the existence of such agreements and combinations.

695.   The Defendants by their actions have manifested actual knowledge that a tortious or illegal act or acts was planned and their intention to aid in such act or acts.

696.   The Defendants maliciously and intentionally conspired, combined and agreed between and among one another to commit one or more of the unlawful acts alleged in this Complaint or to commit acts by unlawful means causing injury to Plaintiff and the Van Kampen Funds and proximately causing injury and damages to the Plaintiff and the Van Kampen Funds for which they are jointly and severally liable.

86

697.    The Van Kampen Funds have suffered damages as a result of the wrongs and the conspiracy to commit such wrongs as alleged in the Complaint in an amount to be proved at trial.

**WHEREFORE**, Plaintiff prays for judgment as follows:

A.    Removing each of the Trustees of the Funds named in this Complaint and replacing them with independent Trustees;

B.    Removing the Adviser Defendants and the Distributor Defendants;

C.    Rescinding the management and other contracts for the Funds with the Adviser Defendants, Distributor and other Defendants;

D.    Rescinding the 12b-1 Plans adopted by the Funds;

E.    Ordering Defendants to disgorge all management fees and other compensation paid to the Adviser Defendants and all profits earned on unlawful trading and all management and other fees earned during the period of such trading,

F.    Awarding monetary damages against all of the Defendants, individually, jointly, or severally, in favor of the Funds, for all losses and damages suffered as a result of the wrongdoings alleged in this Complaint, including punitive damages where appropriate, together with interest thereon,

G.    Awarding Plaintiffs the fees and expenses incurred in this action, including reasonable allowance of fees for plaintiffs' attorneys, and experts,

H.    Granting Plaintiffs such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: 2/22/2005

By: TYDINGS & ROSENBERG LLP

_____
John B. Isbister (Bar No. 00639)
100 East Pratt Street, 26th Floor
Baltimore, Maryland 21202
(410) 752-9700
(410) 727-5460

CHIMICLES & TIKELLIS LLP
Nicholas E. Chimicles
Michael D. Gottsch
Denise Davis Schwartzman
Timothy N. Mathews
361 W. Lancaster Avenue
Haverford, PA 19041
(610) 642-8500

WOLF HALDENSTEIN ADLER
    FREEMAN & HERZ LLP
Daniel W. Krasner
Mark C. Rifkin
Demet Basar
Robert Abrams
270 Madison Avenue
New York, NY 10016
(212) 545-4600

POMERANTZ, HAUDEK, BLOCK,
    GROSSMAN & GROSS, LLP
Stanley M. Grossman
H. Adam Prussin
100 Park Avenue
New York, NY 10017
(212) 661-1100

## Exhibit A
## Van Kampen Trusts and Funds

**Van Kampen U.S. Government Trust** (DE Trust)
    Van Kampen U.S. Mortgage Fund
**Van Kampen Tax Free Trust** (MA Trust)
    Van Kampen Insured Tax Free Income Fund
    Van Kampen Strategic Municipal Income Fund
    Van Kampen California Insured Tax Free Fund
    Van Kampen Municipal Income Fund
    Van Kampen Intermediate Term Municipal Income Fund
    Van Kampen New York Tax Free Income Fund
**Van Kampen Trust** (DE Trust)
    Van Kampen High Yield Fund
**Van Kampen Equity Trust** (DE Trust)
    Van Kampen Aggressive Growth Fund
    Van Kampen Mid Cap Growth Fund
    Van Kampen Select Growth Fund
    Van Kampen Small Company Growth Fund
    Van Kampen Small Cap Growth Fund
    Van Kampen Small Cap Value Fund
    Van Kampen Utility Fund
    Van Kampen Value Opportunities Fund
**Van Kampen Equity Trust II** (DE Trust)
    Van Kampen International Advantage Fund
    Van Kampen Technology Fund
**Van Kampen Pennsylvania Tax Free Income Fund** (PA Trust)
**Van Kampen Tax Free Money Fund** (MA Trust)
**Van Kampen Comstock Fund** (DE Trust)
**Van Kampen Corporate Bond Fund** (DE Trust)
**Van Kampen Emerging Growth Fund** (DE Trust)
**Van Kampen Enterprise Fund** (DE Trust)
**Van Kampen Equity and Income Fund** (DE Trust)
**Van Kampen Limited Duration Fund** (DE Trust)
**Van Kampen Government Securities Fund** (DE Trust)
**Van Kampen Growth and Income Fund** (DE Trust)
**Van Kampen Harbor Fund** (DE Trust)
**Van Kampen High Income Corporate Bond Fund** (DE Trust)
**Van Kampen Pace Fund** (DE Trust)
**Van Kampen Real Estate Securities Fund** (DE Trust)
**Van Kampen Reserve Fund** (DE Trust)
**Van Kampen Tax Exempt Trust** (DE Trust)
    Van Kampen High Yield Municipal Fund
**Van Kampen Series Fund, Inc.** (MD Trust)
    Van Kampen American Value Fund
    Van Kampen Emerging Markets Debt Fund*

Van Kampen Emerging Markets Fund
Van Kampen Emerging Markets Income Fund
Van Kampen Equity Growth Fund
Van Kampen Focus Equity Fund
Van Kampen Global Equity Allocation Fund
Van Kampen Global Value Equity Fund
Van Kampen Growth and Income Fund II*
Van Kampen International Magnum Fund
Van Kampen Japanese Equity Fund*
Van Kampen Global Franchise Fund


* Funds that have not commenced investment operations.

## VERIFICATION OF PLAINTIFF

Zachary Alan Starr, the plaintiff in the above styled action declares:

I purchased shares of the Van Kampen Equity and Income Fund and shares of the Van Kampen Small Cap Value Fund and continue to hold such shares. I reviewed the Complaint and authorized counsel to file the Complaint. This action is not collusive to confer jurisdiction on the United States which it would not otherwise have.

I declare the above to be true under the penalty of perjury.

Dated: 2/18/05

Zachary Alan Starr